## IN  THE  UNITED  STATES  BANKRUPTCY  COURT
## FOR  THE  DISTRICT  OF  DELAWARE

|  |  |
|---|---|
| In re:<br><br>**ATOPTECH, INC.,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 17-10111 (MFW) |

### DECLARATION OF JUE-HSIEN CHERN IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, Jue-Hsien Chern, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer of ATopTech, Inc., a Delaware Corporation (the "Debtor" or the "Company").

2.      I submit this Declaration (the "Declaration") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and pleadings filed on the date hereof (the "Petition Date") seeking various types of "first day" relief (collectively, the "First Day Motions"), and to provide an overview of the Debtor's business and its need for restructuring under chapter 11 of the Bankruptcy Code.

3.      I am familiar with the Debtor's day-to-day operations, books and records, businesses, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtor's business, employees, operations, and finances; information learned from my review of relevant documents; my discussions with other members of the Debtor's senior management and other professionals; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I would and could testify competently to the facts set forth in

---

[1]  The last four digits of the Debtor's federal tax identification number are 1945.  The Debtor's headquarters and mailing address is 2111 Tasman Drive, Santa Clara, CA 95054.

this Declaration and the First Day Motions.  I am authorized to submit this Declaration on the Debtor's behalf.

## I.    THE COMPANY'S BUSINESS

1.    Founded in April 2003 by a team of industry experts, the Company competes in the physical design segment of the electronic design automation ("EDA") industry, developing technology and manufacturing software solutions for engineers in the physical design of integrated circuits ("ICs").  The Company's timing, placement, and routing engines provide a unique, seamless integrated approach for complex chip designs, and its advanced design tools allow engineers to expediently and efficiently design complex chips with higher yield/margin and superior chip performance.  The Company's software has enabled it to achieve the third highest market share position within the predominant place and route ("P&R") segment of the EDA market, and it is one of only a few vendors whose solutions are certified by the leading foundries.  The Company presently maintains a strong IP portfolio that includes seven U.S. patents.

2.    Since its inception, the Company has had a successful history of solid growth expanding to a workforce of 120 employees, including seasoned professionals with proven track records within the EDA industry and experienced research and development teams based in the U.S. and in Asia.

3.    Over its years of operations, the Company has established and fostered long-term relationships with a diverse, global customer base of leading semiconductor vendors.  Due to strong customer satisfaction, the Company maintains high retention and renewal rates with a roster of customers which include Samsung, Broadcom and Xilinx, and has demonstrated capabilities to expand within existing customers.  It also has partnered through a collaboration agreement with a key Chinese EDA company, and has been selected as "Partner of the Year" annually since 2012 by one of the world's leading foundries.

4.    The Company is well-positioned to exploit both the EDA market with its innovative and versatile products directly addressing the P&R and physical design segments

comprising approximately $581 million of the market share, as well as adjacent segments comprising approximately $600 million of the IC design market.  The Company's established presence throughout Asia is especially appealing in view of the steady, accelerated growth of, and investment in, IC design and the EDA market in China since 2010.

## II.  COMPANY ORGANIZATION, CAPITAL AND DEBT STRUCTURE AND RECENT FINANCIAL PERFORMANCE

### A.  Company Structure

5.      The Company operates out of Santa Clara, California, where its headquarter office is located.  The Company operates a branch comprised of two offices located in Taiwan which handle sales, customer support, and research and software development.  The Company is the 100% owner of four subsidiaries: AtopTech Co., Ltd. in Japan and AtopTech Korea Ltd. in South Korea both provide distributor, sales and customer support functions, and AtopTech Design Automation Pvt. Ltd. in India serves as a customer support center, while ATopTech Design Solutions Israel Ltd. is merely a formed entity but has no business operations, employees or physical presence.   None of the branch offices or subsidiaries conducts business activities independent of the Company's business.  The Company is a party to separate agreements which govern the terms of service provided by each subsidiary, and under which the Company pays for services provided by the subsidiaries, as described in greater detail below.

6.      Historically, the Company has prepared consolidated financial statements for the U.S. headquarter office and its Taiwan branches as a single enterprise, while each subsidiary maintains its own financials to ensure compliance with local tax reporting and filing requirements.  An organization chart illustrating the Company's structure is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

### B.  Capital Structure

7.      The Company's only secured creditor is Silicon Valley Bank ("SVB").  Pursuant to that certain Loan and Security Agreement dated September 5, 2014, as amended by that certain First Amendment to Loan and Security Agreement dated November 12, 2015 (as may be

amended, modified, restated, replaced or supplemented from time to time, collectively, the "Loan Documents"), (i) the Company granted to SVB a security interest in all existing and after acquired personal property of the Company (the "Pre-Petition Collateral") as security for the Company's Obligations under and as defined in the Loan Documents to SVB, and (ii) the Company is indebted to SVB in the approximate amounts of (a) $125,000 under a 36-month term loan which matures in October 2017, and (b) $347,000 under a 36-month term loan which matures in February 2019 (together, the "Term Loan"), plus interest and allowable costs and fees.

        8.      A recent search of the records of the Delaware Secretary of State under the search name ATopTech, Inc. is summarized below and confirms that SVB is the only entity which has filed an UCC-1 financing statement and that there are no other liens and security interests on the Company's pre-petition property.

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Silicon Valley Bank | 9/10/14 | Blanket security interest on all assets as set forth in the Loan Documents |

        9.      The Debtor believes that the Loan Documents executed and delivered by the Debtor to SVB are valid, binding and enforceable in accordance with their terms by SVB against the Debtor and are not subject to avoidance, whether under the Bankruptcy Code or otherwise. SVB duly and validly perfected its liens upon and security interests in the Pre-Petition Collateral by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments, certificates, or other property. All of such financing statements were validly authorized by authorized representatives of the Debtor.

        10.      The Debtor possesses cash well in excess of the amount of SVB's secured claim (the "Surplus Cash"). The Debtor therefore does not believe that the Surplus Cash constitutes cash collateral.

4

11.     Other than indebtedness under the Term Loan, the Company's debt is comprised of six general unsecured claims approximating $33.6 million, of which $30.8 million is based on contingent or disputed amounts, including the claim of Synopsys based on the Synopsys Verdict (discussed below), as set forth on the Debtor's *Schedule F* which will be filed in this Chapter 11 case and employee PTO and wage-related claims approximating $791,000 as set forth on Debtor's *Schedule E* which will be filed in this Chapter 11 case and which are discussed below.

### C.     Recent Financial Performance

12.     The Debtor's consolidated balance sheet as of November 30, 2016, lists (a) assets of $21,077,796, which includes $10,410,718 in cash and $8,208,265  in receivables, (b) liabilities of $13,864,907 which include $2,766,492 in payables and $317,976 in long-term liabilities (including amounts owed to SVB under the Term Loan), and (c) total capital, including stockholder equity, of $7,020,816.

13.     The Company has seen a steady increase in annual revenue since 2011, with revenues of $20.1 million in 2013, $22.9 million in 2014 and $26.0 million in 2015.  Adjusted for litigation and transaction expenses, the Company's EBITDA increased from $1.3 million in 2013[2], to $3.0 million in 2014, to $4.9 million in 2015.

## III.     LITIGATION PRECIPITATING COMMENCEMENT OF BANKRUPTCY CASE

14.     As set forth above, the Company has achieved steady financial growth over the past several years, becoming a leader in the EDA field.  However, in June 2013, Synopsys, Inc. ("Synopsys") commenced an action in the U.S. District Court for the Northern District of California, entitled *Synopsys, Inc. v. ATopTech, Inc.*, Case No. 13-02965-SC (the "Synopsys Action"), asserting claims for copyright infringement, infringement of four patents, breach of a license agreement between the parties and breach of the covenant of good faith and fair dealing. The Company counterclaimed for declaratory relief that the copyrights at issue were invalid,

---

[2] This figure decreased from $3.0 million in 2012 due to the Company's substantial investment in research and development during 2013.

antitrust violations under the Sherman Act and violations of the California Business and Professions Code. Over the course of the three-plus years of litigation, the Company, through a motion to dismiss, successfully limited the scope and extent of Synopsys' breach of contract claim and through summary judgment, limited the scope and extent of Synopsys' copyright infringement claims. However, in March 2016, after a three-week trial, the jury found in favor of Synopsys on the remaining copyright claim which alleged that the Company's P&R engine product, Aprisa, infringed on copyrighted elements contained in one of Synopsys' products, awarding $30.4 million to Synopsys (the "Synopsys Verdict"). The Company prevailed on the breach of contract and covenant of good faith claims, as well as copyright claims based on a different Synopsys product. The district court severed the Company's affirmative defense of equitable estoppel and held a bench trial on that defense commencing on July 25, 2016. After taking the matter under submission, on October 24, 2016, the Court ruled against the Company on the equitable estoppel defense. However, the Court has not entered a judgment with respect to the copyright matter as there remain patent and antitrust counterclaims for which a trial has not yet occurred.

15. Trial on the patent claims asserted by Synopsys is now scheduled for March 1, 2017. While these claims have been narrowed, certain claims from three separate patents remain. Synopsys asserts damages of approximately $1.2 million if the verdict for the copyright claims is upheld and of as much as $23.2 million if the verdict on the copyright claims is not upheld. A trial date for the Company's antitrust counterclaims has not been set, but that aspect of the case is scheduled to begin after the patent claims are decided.

16. The Company may be entitled to attorneys' fees incurred in defending the contract and covenant of good faith claims, on which it prevailed. It is difficult at this time to estimate the amount of these attorneys' fees, since it is necessary to determine the fees incurred in this aspect of the case as opposed to the other aspects. Given the three years of litigation, the final amount of these fees once determined is likely to be significant. Damage assessment has not begun with respect to the antitrust counterclaims. Damages for these claims will depend on

6

the lost sales and profits that the Company is able to prove were caused by the alleged anticompetitive acts, and any damage amount determined by a jury will be trebled by the court.

17.     The Company has taken major steps to remove the command terms and related material that were accused of copyright infringement in the case from the current version of Aprisa.  The Company believes that the current version of Aprisa, which has been the only version sold since May 2016, contains no terms or features that Synopsys has alleged infringe on its copyrights.  As a result, the Aprisa product, and use thereof, should not be affected by the adverse jury verdict.  However, the level of damages awarded to Synopsys created significant issues for the Company's ability to continue operations as a going concern.

### IV.     PRE-PETITION MARKETING AND STALKING HORSE BID

18.     The Company is a licensor under license agreements with several customers.  The licenses granted thereunder are renewed on an annual basis.  As a result of the Synopsys Verdict, the Company is concerned that the customer-licensees may seek alternatives due to any uncertainty that the Company will continue to operate as a going concern.

19.     Since the award of the Synopsys Verdict, the Company has taken steps to streamline its operations including ceasing any investment into its growth.  In addition, the Company's board of directors thoroughly considered options available to the Company and decided that it was in the best interests of the Company's creditors and equity holders to consider strategic alternatives, including consummating some form of sale, merger, acquisition and/or related transaction (a "Transaction").  In July 2016, the Company retained Cowen and Company ("Cowen") as its investment banker to assist in exploring a potential Transaction.

20.     After consultation with various representatives and advisors, including Cowen, the Company made a strategic decision to file for bankruptcy to provide the Company time to restructure its finances and operations, further market its assets, negotiate sale terms, and conduct an auction of its assets to the highest bidder, under the auspices and protection of the Bankruptcy Court.  Moreover, the Company determined that executing a Transaction within a chapter 11 case would incentivize potential bidders who might otherwise be wary of risks emanating from

the Synopsys Action.  As a result, the Debtor filed its Voluntary Petition on the Petition Date,

commencing this Chapter 11 case.

21.     Since its retention, Cowen has engaged in a comprehensive marketing process.

Among other things, Cowen contacted over 140 potential interested parties comprised of both

strategic and financial buyers both in the United States and China, which resulted in scheduling

introductory conferences with over 50 entities.  Subsequently, 29 entities expressed continued

interest and executed non-disclosure agreements.

22.     Cowen continued discussions with these entities and transmitted bid letters and

draft asset purchase agreements to 14 entities that continued to express interest, and Cowen

established a deadline of October 31, 2016, for interested parties to submit proposals to qualify

as a stalking horse bidder.  In response, three parties submitted bids, and others expressed

interest but indicated that they were not prepared at the time to commit to submitting a bid.  The

board, in consultation with counsel and Cowen, evaluated the three bids, negotiated revisions to

the bids and eventually decided to pursue what it considered to be highest or otherwise best bid.

23.     After evaluating the three bids, Cowen prepared a summary for the Company's

board of directors, and the board met with its advisors, including its counsel and Cowen, on

November 3, 2016, to comprehensively evaluate the bids.  Cowen and the Company's counsel

negotiated various provisions on the bids and on November 7, 2016, the Company's board of

directors held a meeting to evaluate the revised proposals, at which meeting, the board posed and

received answers to its numerous questions.

24.     Initially, the board decided to pursue the bid submitted by one bidder, and, at the

Company's direction, Cowen engaged that bidder in negotiations which culminated in the

execution of a letter of intent and the negotiation of substantial terms of an asset purchase

agreement.  However, after several rounds of negotiations, the board and the Company

determined that certain demands made by the proposed bidder were not in the best interests of

the Company and decided to cease negotiations and pursue alternatives.

25.     Consequently, the Company evaluated other bids and considered one alternative

offer before turning its focus to another interested party which submitted a more attractive bid, Draper Athena ("Draper Athena").  Again at the Company's direction, Cowen engaged Draper Athena in negotiations over several days, and, after multiple exchanges of drafts, the Company and Draper Athena executed a Letter of Intent on December 2, 2016.  Under the Letter of Intent, among other things, Draper Athena required certain conditions to be satisfied including the Debtor requesting the Court to approve, on an expedited basis, certain bidding and sale procedures and break-up fee provisions and the closing of a Transaction to the Stalking Horse by the end of March 2017.  The parties now have negotiated and drafted a definitive asset purchase agreement (the "Purchase Agreement") based on the terms set forth in the Letter of Intent and setting forth the terms and conditions for the sale to and the purchase of certain of the Debtor's assets by a Delaware corporation to be formed by Draper Athena (the "Stalking Horse").[3] Because the proposed Transaction would permit the business to be sold as a going concern and given the extensive marketing efforts undertaken by Cowen and analysis of the offers received thus far, the Debtor has determined that Draper Athena's bid represents the best opportunity for the Debtor to maximize the value of its estate and serve as a basis for conducting an auction to seek higher or otherwise better offers.

26.     Among other things, the bidding procedures negotiated with Draper Athena in connection with the Purchase Agreement provide that Draper Athena will receive a break-up fee in the amount of $400,000 and an expense reimbursement no greater than $600,000 (together, the "Stalking Horse Buyer Protections"), in the event a Transaction is consummated to another bidder.

27.     Based on my negotiations with Draper Athena and discussions with the Debtor's professionals and also on information and belief:

---

[3] It is contemplated that Draper Athena Management Co. Ltd, a Chinese limited liability company, will be the guarantor of the obligations undertaken by the Stalking Horse in the Purchase Agreement.

a.      The circumstances of this Sale are particularly unique and challenging due to the ongoing Synopsys Litigation, which is directed not only at the Debtor, but also at the assets proposed to be acquired under the Purchase Agreement (the "Acquired Assets"). Performing diligence on complex, multi-year intellectual property litigation like the Synopsys Litigation was an enormous task in its own right.  In addition to understanding the historical posture and risks of the Synopsys Litigation, parties interested in purchasing the Acquired Assets, including the Stalking Horse, recognize that given the history of litigation between the Debtor and Synopsys it is foreseeable that there will be ongoing disputes with Synopsys in this Chapter 11 Case, including the potential for disputes regarding the Acquired Assets.  As a result, the amount of diligence and potential for ongoing costs go well beyond what could be expected in a typical transaction of this size;

b.      In order to complete the Transaction, the Stalking Horse will need to comply with regulations issued by and obtain approval from the Committee on Foreign Investment in the United States ("**CFIUS**") prior to the hearing date on the Sale Motion.  CFIUS is an inter-agency committee under the Treasury Department which is authorized to review transactions that could result in control of a U.S. business by a foreign person in order to determine the effect of such transactions on the national security of the United States.  The process involves filing a notice with CFIUS in the form and content as set forth in the regulations and responding to issues or questions raised.  The Stalking Horse is also required to provide two certifications, one at the beginning of the process and the second at the end, attesting to the truth of the matters set forth in the notice.  Compliance with CFIUS has added and will add significant expense to Draper Athena and the Stalking Horse;

c.      Without the benefit of the Stalking Horse Buyer Protections, the Stalking Horse would have been unwilling to commit to proceed with a Transaction with the costly and burdensome diligence process and risk present here, given the uncertainty whether it would prevail as the successful bidder.  The Stalking Horse Buyer Protections, therefore, are a

necessary incentive to induce the Stalking Horse into committing to the sale process and to purchasing the Acquired Assets for a price that the Debtor believes is fair consideration;

        d.      The Stalking Horse Buyer Protections have a direct and meaningful benefit to the Debtor and its estate.  By inducing the Stalking Horse to enter into the Purchase Agreement, a baseline bid for subsequent interested purchasers is set.  The Stalking Horse's commitment to the purchase of the Acquired Assets signals to the market that the Synopsys Litigation has not rendered the Acquired Assets toxic, increasing their value in the eyes of potential bidders for the ultimate benefit of the Debtor's estate and its stakeholders;

        e.      In preparing the Purchase Agreement, the Stalking Horse and the Debtor have engaged in negotiations that have resulted in an agreement that covers most, if not all, of the issues which potential bidders will face and that other potential bidders now can use to their benefit as a template to prepare a qualifying bid.

### V.    THE DEBTOR'S BUSINESS PLAN AND FIRST DAY MOTIONS

        28.      The Company believes that it is well-positioned to complete a Transaction for its assets and that the ultimate purchaser will realize significant short term and long term value, especially because of the Company's ability to potentially scale dramatically within the context of sufficient working capital and a stronger balance sheet, enabled by its expert workforce, solid customer base and innovative, acclaimed products.  As summarized above, but for the Synopsys Award, the Company possesses positive EBITDA, strong operations and a favorable debt position.  Moreover, the Company believes that the Stalking Horse's agreement to act as the stalking horse will facilitate a Transaction as a going concern rather than in a "fire sale" liquidation which might occur in the absence of a stalking horse.

        29.      Due to the potential loss of customer-licensees at the beginning for the license renewal process early next year, the Company must expedite the closing of any Transaction prior to that time in order to maximize retention of customers and customer relationships.  Otherwise, any customer departures will result in a significant loss of revenue and going concern value of the Company.  As set forth above, Draper Athena requires the Transaction under the Purchase

Agreement close by the end of March 2017.

30.    Accordingly, during its bankruptcy case, the Debtor intends, among other things, to continue to market its assets, conduct an auction with the Stalking Horse as its stalking horse, consummate a Transaction, and then to distribute proceeds of such Transaction to creditors in accordance with the Bankruptcy Code.

31.    In order to ensure that their assets realize a maximum return from a Transaction, the Debtor believes that it must maintain its business operations as a going concern during the marketing and sale process.  Consequently, in order to ensure that the Company's operations are not disrupted, the Debtor is filing certain First Day Motions contemporaneously with this Declaration, the supporting facts of which and relief requested in each are set forth below.  I have reviewed the First Day Motions and confirm that the facts set forth therein are true and correct to the best of my knowledge and belief.

### A.    Claims Agent Motion

32.    Through the *Application Of The Debtor For Entry Of An Order Pursuant To 28 U.S.C. § 156(c) Approving The Retention And Appointment Of Epiq Bankruptcy Solutions, LLC As The Claims And Noticing Agent To The Debtors, Effective Nunc Pro Tunc To The Petition Date* (the "Claims Agent Motion"), the Debtor seeks the Court's appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") to serve as claims and noticing agent and to assist with the administration of this Chapter 11 case.  The proposed services that Epiq will provide are set forth on Exhibit "C" attached to the Claims Agent Motion.

33.    There are over 330 parties in interest including creditors, employees, stockholders, contract counterparties and other entities which are included on the Debtor's creditor matrix submitted to the Court in this Chapter 11 case.

34.    In view of the number of parties in interest, the Debtor believes that retention of a claims and noticing agent will facilitate administration of the bankruptcy case, including in the distribution of notices and the processing of claims.  Accordingly, the Debtor, through its representatives, solicited and reviewed engagement proposals from five other claims and

noticing agents, all of which are listed on the Court's list of claims agencies posted on its website at: http://www.deb.uscourts.gov/ClaimsAgents/ClaimsAgents.aspx.

35.     After evaluation and competitive comparison of the six proposals, the Debtor selected Epiq and determined that Epiq's proposal constitutes the most cost-effective and best proposal in view of the circumstances underlying this bankruptcy case and the Debtor's needs for noticing and claims management therein.

36.     Epiq requested, and the Debtor agreed, to pay a retainer of $25,000 to cover a portion Epiq's initial fees and costs, as identified on Exhibit "1" to the Declaration of Brian Karpuk filed as Exhibit A to the Claims Agent Motion.

37.     The Debtor believes that appointment of Epiq will facilitate administration of the bankruptcy case in a cost-effective manner and alleviate the burden on the Clerk of the Court.

### B.    Cash Collateral Motion

38.     Through the *Motion of the Debtor for Interim and Final Orders Pursuant to Sections 105, 363(c), and 506 of the Bankruptcy Code Authorizing Debtor To (A) Utilize  Cash Collateral; (B) Confirm Adequate Protection; and (C) Allow and  Pay Secured Claim* (the "Cash Collateral Motion"), the Debtor seeks authorization (a) to pay the secured claim of SVB in order to avoid further interest accruals and costs and to facilitate the consummation of the Transaction, and (b) to use its Surplus Cash to pay post-petition expenses in the ordinary course of business.

39.     As of December 31, 2016, the Debtor had approximately $10.5 million in cash and cash equivalents, $8.5 million of which is held at SVB (the "SVB Accounts").  The Debtor anticipates closing a sale of substantially all of its assets within 60 - 75 days of the Petition Date and believes that its cash reserves are sufficient to fund operations through the closing of the Transaction.

40.     Because the Surplus Cash exceeds the amount of SVB's secured claim, the Debtor does not believe that it constitutes cash collateral.

41.     The Debtor has prepared a 13-week cash operating budget, a copy of which is attached as Exhibit "A" to the Cash Collateral Motion, reflecting the anticipated receipt of

revenues and operating expenses of the Debtor during the Chapter 11 case prior to the close of a Transaction.

### C.      Cash Management Motion

42.      Through the *Motion Of The Debtor For Entry of Interim and Final Orders (A) Authorizing the Continued Use of Its Existing Cash Management System, Including Maintenance of Bank Accounts and Existing Business Forms and Checks; (B) Authorizing the Continuation of Intercompany Transactions; and (C) Waiving the Requirements of 11 U.S.C. § 345(b)* (the "Cash Management Motion"), the Debtor seeks the entry of interim and final orders authorizing the Debtor to continue use of its existing bank accounts, cash management systems, and business forms and to continue certain ordinary course intercompany transactions.

### i.      Cash Management

43.      The Debtor utilizes a centralized cash management system designed to collect, transfer, and disburse funds generated from customer payments, subsidiaries and the exercise of options by holders of stock options, as well as to track all intercompany transfers (the "Cash Management System").  The bank accounts used in connection with the Cash Management System (collectively, the "Bank Accounts") are listed on Exhibit "A" to the Cash Management Motion.

44.      With respect to the Debtor's U.S. operations, the Cash Management System includes six Bank Accounts described as follows: (i) a checking account with SVB which maintains a minimum balance of $2 million, into which funds from the Receivables Account (defined below) are transferred daily and from which funds to the Payment Account (defined below) are transferred daily (the "Concentration Account"); (ii) a checking account with SVB from which payments to SVB for interest expense on the Term Loan, payments to vendors and suppliers, including the Debtor's payroll servicer ADP TotalSource, Inc. ("ADP"), and other operational expenses are disbursed (the "Payment Account"); (iii) a checking account with SVB into which incoming payments from customers, subsidiaries and stockholders are collected (the "Receivables Account"); (iv) a money market account  into which funds from the Concentration

Account which exceed the minimum $2 million balance are transferred (the "Sweep Account"); and (v) two deposit accounts with Wells Fargo Bank which together hold a balance of approximately $1.5 million and are used solely for automatic payments to the Debtor's gas and electric utility provider (the "Wells Fargo Accounts").[4]

45.    The Sweep Account also functions as the Debtor's investment account from which the Debtor earns monthly interest through SVB's Cash Sweep Program which invests in the Goldman Sachs Financial Square Treasury Obligations Fund, the JP Morgan U.S. Treasury Plus Money Market Fund and the Federated Treasury Obligations Fund (collectively, the "Treasury Funds").  True and correct copies of the fact sheets and the prospectuses for the Treasury Funds obtained from SVB's website at https://www.svb.com/cash-sweep/ are collectively attached as Exhibit "B" to the Cash Management Motion.  As set forth therein, the Treasury Funds are comprised of, among other things, U.S. Dollar denominated money market investments in commercial paper and other short-term debt securities (including floating and variable rate demand notes of U.S. and foreign corporations and repurchase agreements secured by such obligations), debt securities issued or guaranteed by qualified U.S. and foreign banks (including certificates of deposit, time deposits and other short-term securities), and securities issued or guaranteed by the U.S. Government (its agencies or instrumentalities).

46.    I am informed that SVB and Wells Fargo Bank are each parties to a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware.

47.    In addition, as illustrated in Exhibit "A" to the Cash Management Motion, the Cash Management System includes five Bank Accounts located in Taiwan described as follows: (i) a deposit account with East Sun Bank held by the Debtor's U.S. headquarter office, into which funds from the Payment Account are transferred and from which funds to the Taiwan

---

[4] Previously the Company banked at Wells Fargo Bank; however, after entering into the Loan Documents, the Company switched its banking to SVB.  The Company retained the Wells Fargo Accounts because after the switch, some existing customers continued to make payments to the Wells Fargo Accounts for a period of time.  While this is no longer the case, the Company continues to retain the Wells Fargo Accounts in the event that the banking relationship with SVB is terminated.

Concentration Account (defined below) are transferred for payment of the Taiwanese branch's service and operations costs (the "Taiwan Transfer Account"); (ii) a deposit account with East Sun Bank held by the Taiwanese branch which receives transfers from the Taiwan Transfer Account upon issuance of invoices by the Taiwanese branch to the U.S. headquarter office for the Taiwanese branch's service and operational costs (the "Taiwan Concentration Account"); (iii) a checking account with East Sun Bank held by the Taiwanese branch into which funds from the Taiwan Concentration Account are transferred and from which payments for the Taiwanese branch's operational costs are disbursed; and (iv) two deposit accounts with Taiwan Cooperative Bank which do not play a significant role in the Cash Management System.

48.    As set forth above, funds are transferred from the Debtor's U.S. Payment Account to the Taiwan Transfer Account, and from there to the other Taiwanese Bank Accounts in direct response to the Taiwanese offices' operational needs and incurred costs.  As a result, the five Taiwanese Bank Accounts do not hold a substantial amount of cash at any particular time, relative to the Debtor's total cash holdings.  As of December 31, 2016, the aggregate amount of cash collectively held in the Taiwanese Bank Accounts was approximately $810,000.

ii.    **Business Forms**.

49.    In the ordinary course of business, the Debtor uses numerous varieties of business forms.  To minimize the expense to the estates and to avoid any confusion with customers, employees, and third parties, the Debtor respectfully requests authorization to continue to use all business forms, including without limitation, checks, letterhead, customer program forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as debtor-in-possession.  Granting this relief will allow the Debtor to avoid the costs and delays of ordering new business forms.  Upon depletion of the current stock of forms and checks, the Debtor will obtain new checks and forms that indicate the debtor-in-possession status as consistent with Local Rule 2015-2(a).

16

iii.        **Intercompany Transfers.**

50.        In connection with the daily operation of the Debtor's business, as funds are moved within the Cash Management System at any given time, there may be intercompany claims owing by the Debtor to one or more of its subsidiaries (the "Intercompany Transactions")[5] as described below.  The Debtor maintains records of all intercompany transfers and can ascertain, trace and account for all Intercompany Transactions.

51.        Non-Debtor subsidiary ATopTech Design Automation Private Limited ("ATopTech Design") is a company incorporated under the Indian Companies Act, 1956, with an office located in Bangalore, India.  The Debtor and ATopTech Design are parties to a Service Agreement, attached as Exhibit "C" to the Cash Management Motion, whereby ATopTech Design provides support to the Debtor's customers using the Debtor's software in and around India.  Such customer support consists of providing after sales services, including consultancy, support and servicing of the software Product (as defined in the Services Agreement). ATopTech Design invoices the Debtor for its Costs (as defined in the Services Agreement) and such Costs are payable by the Debtor within thirty (30) days of the date of such invoice.  The Debtor pays ATopTech Design approximately $87,000 per month on average under the Services Agreement.

52.        Non-Debtor subsidiary ATopTech Korea Ltd. ("ATopTech Korea") is an entity incorporated in Korea.  The Debtor and ATopTech Korea are parties to a Service and Marketing Agreement, attached as Exhibit "D" to the Cash Management Motion, whereby ATopTech Korea provides support for the sale of the Debtor's products and performs services related to the sale of the Debtor's products in a specified territory, including any marketing promotion and advertising actions, as more fully set forth in the Service and Marketing Agreement.  The Debtor

---

[5] In addition to the Intercompany Transactions, the Debtor supports the maintenance of its subsidiary in Israel, ATopTech Design Solutions Israel Ltd.  There are no agreements between the Debtor and this subsidiary.  The Debtor has paid only the minimum costs (as of November 30, 2016, an aggregate of approximately $8,700 which is booked as a receivable owed to the Debtor) required to maintain the existence of this entity as the Debtor believes that it may be worthwhile to the business and to prospective interested purchasers.

pays ATopTech Korea a Service Fee under the Service and Marketing Agreement, and such Service Fee is payable within forty-five (45) days after the end of each quarter.  The Debtor pays ATopTech Korea approximately $48,000 per month on average under the Service and Marketing Agreement.

### D.    Employee Obligations Motion

53.    Through the *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor To Honor Prepetition Employee Wages, And Contributions To Employee Benefit Plans; And (II) For The Debtor, Banks, And Other Financial Institutions To Comply With Procedures Relating Thereto*, the Debtor seeks the entry of interim and final orders authorizing the Debtor to maintain and continue to honor and pay all amounts arising from its business practices, programs, and policies for its employees in effect as of the Petition Date, as may be modified or supplemented from time to time in the ordinary course of business, relating to, among other things wage obligations, paid time off, reimbursable expenses, and certain employee benefits, each described below (collectively, the "Employee Obligations").

### i.    Debtor's Workforce

54.    The company currently employs 86 full-time employees across commerce, technology, and business operation functions.  Each employee's relationship is governed by employment agreements with the Debtor, and all employment is "at will" employment.

55.    The Debtor's workforce is critical to its business operations.  Each of the Debtor's employees is essential not only to the continued, uninterrupted operation of the Debtor's business, but to effectuating the orderly administration of the bankruptcy case.  The Debtor's remaining employees have distinct experience and expertise that are vital to the Debtor's operations.  Among other things, the Debtor requires its remaining employees to execute the development, marketing and customer service functions associated with its unique product and services.  Failure to meet commitments and to maintain relationships with vendors and users/customers will open the door to competitors and will eliminate growth.  As a result, the Debtor's business will lose its going concern value, and its assets, including its customer

relations, will be harmed.

56.     Moreover, based on the marketing efforts of Cowen and the Company and discussions with potential purchasers, the Debtor believes that parties interested in consummating a Transaction for the Debtor's assets will require many of the Debtor's employees to continue their employment with the acquiring entity.

ii.     **Wage Obligations**

57.     For the U.S. entity, the Debtor pays its employees on biweekly basis, and biweekly payroll, including wages and salaries, is estimated to be $420,000 per period.  For the Taiwan entity, the Debtor pays its employees on a monthly basis, and monthly payroll, including wages and salaries, is estimated to be $108,000 per month.  Payroll payments are made via direct deposit through electronic transfer of funds directly to the employees or via check.

58.     The Debtor utilizes ADP Total Source, a human resources solutions provider, to process payroll, withholdings and deductions.  ADP typically debits the Debtor's Payment Account in the amount of the applicable payroll, which includes a processing fee, two business days before employees are scheduled to be paid.  ADP then issues payment directly to the employees.

59.     On December 30, 2016, the Debtor paid its U.S. employees pre-petition wages for the period ending January 6, 2017.  On December 29, 2016, the Debtor paid its Taiwan employees pre-petition wages for the period through December 31, 2016.   The accrued wages owed to employees approximates an aggregate of $198,000.

60.     The Debtor directly or indirectly reimburses employees for certain approved expenses incurred on behalf of the Debtor in the scope of their employment for air travel, lodging, ground transportation, travel and business meals, business entertainment, telephone, and other business-related expenses ("Reimbursable Expenses").  The Debtor permits each employee to use his or her own personal credit card for such expenses for which the Debtor reimburses the employee.  The Debtor estimates that the unpaid Reimbursable Expenses for the pre-petition period are nominal and no more than $25,000 in aggregate.

61.     The Debtor withholds from each employee wage amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities.  The Debtor then matches from its own funds social security and Medicare taxes and pays, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance.

62.     Payroll taxes are generally processed by ADP and forwarded to the appropriate federal, state, or local taxing authorities at the same time employee payroll is administered.  The Debtor pays ADP a fee of approximately $50.00 per employee for its payroll services per pay period.

63.     In the ordinary course, the Debtor provides allotted PTO to its employees.  For the U.S. entity, accrued PTO is capped at a maximum of between 120 and 160 hours, depending on the duration of employment, but does not expire.  For the Taiwanese entity, accrued PTO which remains unused at the end of the following calendar year, expires.  The Debtor believes that, as of the Petition Date, 57 of the U.S. employees have accrued PTO which aggregates to a corresponding monetary value of approximately $524,000 and 25 of the Taiwan employees have accrued PTO which aggregates to a corresponding monetary value of approximately $69,000.

        iii.       **Employee Benefits**

        a.       **Health Benefit Plans**

64.     Partnering with certain carriers, California Choice is the sponsor of the Debtor's medical benefit plans and ADP is the sponsor of the Debtor's dental and vision benefit plans.

65.     Generally, but depending on the level of coverage selected by a particular employee, the Debtor funds up to 100% of premiums for medical and 90% of premiums for dental coverage of each employee.  In addition, the Debtor generally funds up to 80% of premiums for medical coverage for each employee's spouse and dependent(s), up to 90% of premiums for dental coverage for each employee's spouse and up to 90% of premiums for dental coverage for each employee's dependent(s).  An optional pre-tax flexible spending account is also available to employees, at their expense, for eligible out-of-pocket health care and

dependent expenses.

66.     The Debtor is current on all of its pre-petition obligations related to the Debtor's health benefit plans.

### b.     Insurance

67.     The Debtor, through ADP, offers employees basic life insurance.  In addition, the Debtor maintains workers' compensation policies to provide its employees with compensation for injuries arising from or related to their employment with the Debtor.  The Debtor pays for basic life insurance coverage up to $75,000 per employee.  In addition, the Debtor provides long-term disability insurance for qualifying disabilities per month.  Employees also are provided the option to elect supplemental life, Accidental Death and Dismemberment and disability insurance.

### c.     Additional Benefits

68.     ADP offers additional benefit programs to the employees, including a 401(k) plan provided through ADP which is not administered by the Company, a pre-tax commuter benefit plan, discounts for various retailers, restaurants, hotels, and other services.

### E.     Utilities Motion

69.     Through the *Motion of the Debtor For Interim and Final Orders (A) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance of Payment* (the "Utilities Motion"), the Debtor seeks the entry of interim and final orders (a) prohibiting its utility providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered pre-petition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for post-petition utility services has been furnished to the utility providers; and (c) establishing procedures for resolving future requests by any utility company for additional adequate assurance of payment.

### i.     Utility Providers

70.      In connection with the operation of its business, the Debtor incurs utility expenses in the ordinary course of business for, among other things, phone, electricity, gas and internet (collectively, the "Utility Services").  On a monthly basis, the Debtor spends approximately $21,400 for the Utility Services.  A list of the companies which provide the Utility Services is attached as Exhibit "A" to the Utilities Motion.

71.      The Debtor believes that it is current with its Utility Services although there may be situations in which payment was not yet due on the Petition Date or where a Utility Service provider has provided services in which the normal monthly bill had not yet been issued on the Petition Date.  The Debtor believes that such pre-petition obligations, if any, are minimal.

### ii.     Adequate Assurance Deposit

72.      The Debtor intends to pay all post-petition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating its businesses post-petition.  However, to provide adequate assurance of payment for future services, the Debtor proposes to deposit an initial sum equal to fifty percent (50%) of the Debtor's estimated average monthly cost of Utility Services (the "Adequate  Assurance Deposit") based on (i) with respect to the U.S. Utility Services, the three-month period preceding the Petition Date and  (ii) with respect to the Taiwan Utility Services, the two-month period preceding the Petition Date[6], into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account")[7] within twenty (20) days of the Petition Date, pending further order of this Court. Because the Debtor's approximate monthly spending on the U.S. and Taiwan Utility Services for the respective three-month and two-month periods preceding the Petition Date is $21,388.83, the total Adequate Assurance Deposit will be $10,694.42, with amounts allocated to each Utility Service as set forth on Exhibit "A" to the Utilities Motion.

---

[6] The Taiwanese Utility Providers invoice the Debtor bi-monthly.
[7] To the extent the Debtor already has deposits with a particular Utility Provider, it will move such deposit to the Adequate Assurance Account to make up a portion of the Adequate Assurance Deposit for each such Utility Provider.

73.     The Debtor further proposes to maintain the Adequate Assurance Account with a minimum balance equal to fifty percent (50%) of the Debtor's estimated average monthly cost of Utility Services through the final hearing on the Motion.  Thereafter, the Debtor proposes to adjust the amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of Utility Services by the Debtor regardless of any Additional Assurance Requests (as defined below), and (ii) agreements with the Utility Providers.  These adjustments will permit the Debtor to maintain the Adequate Assurance Account with an amount that consistently provides the Utility Providers that do not otherwise hold deposits or security for its Utility Services with a half-monthly deposit on account of such services.

74.     The Debtor submits that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtor's Chapter 11 case (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.  Specifically, the Debtor's available cash is more than adequate to meet its cash needs during this case and the Debtor requires uninterrupted use of its utility services to preserve its going concern value.  As a result, the Debtor is very likely to continue paying its obligations to the Utility Providers post-petition.

75.     These protections ensure that all Utility Providers will have adequate assurance of payment throughout this case, and the Debtor believes that no other or further assurance is necessary.

## VI.     CONCLUSION

76.     This Declaration describes the factors that have precipitated in the commencement of this Chapter 11 case and demonstrates the need for the Debtor to obtain the relief requested in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

/ / /

/ / /

Dated:  January *12*, 2017

Jue Hsien Chern, Chief Executive Officer

*Santa Clara*_____, California

24