## IN THE  UNITED STATES BANKRUPTCY  COURT
## FOR THE DISTRICT  OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>**ATOPTECH, INC.,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 17-10111(MFW)<br><br>Bidding Procedures Hearing Date:  TBD<br>Bidding Procedures Objection Deadline: TBD<br>Sale Hearing Date:  TBD<br>Sale Objection Deadline:  TBD |

**MOTION OF DEBTOR FOR ORDERS (I) AUTHORIZING AND APPROVING (A) BIDDING PROCEDURES, (B) BUYER PROTECTIONS FOR STALKING HORSE, (C) PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) THE FORM AND MANNER OF NOTICE;(II) SCHEDULING THE BID DEADLINE AND AUCTION (III) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "**Debtor**" or the "**Company**")

moves this Court pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

"**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 and 9018-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "**Local Rules**"), for entry of orders (i) authorizing and approving (a) bidding

procedures (as attached hereto as **Exhibit A**, the "**Bidding Procedures**"), (b) buyer protections for

stalking horse, including granting administrative expense priority to the Break-Up Fee and Expense

Reimbursement (as defined below) to be paid by the Debtor to the Stalking Horse (as defined

below), (c) procedures related to the assumption and assignment of certain executory contracts and

unexpired leases and (d) the form and manner of service of the above-mentioned relief (the "**Sale**

---

[1]  The last four digits of the Debtor's federal tax identification number are 1945.  The Debtor's headquarters and mailing address is 2111 Tasman Drive, Santa Clara, CA 95054.

**Notice Procedures**"); (ii) scheduling the deadline to submit offers to purchase the Acquired Assets (as defined below) and scheduling an auction for such offers; (iii) authorizing and approving (a) the sale of the Debtor's right, title and interest in the assets used in its business (net of cash, the "**Acquired Assets**"), free and clear of all liens, claims, encumbrances and interests (each as described below), pursuant to section 363 of the Bankruptcy Code and (b) the assumption and assignment of certain contracts of the Debtor and (iv) granting such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtor relies on the Declaration of Jue-Hsien Chern in Support of First Day Motions at Docket No. 3 (the "**Chern Declaration**") and the Declaration of Randy Lederman attached to this Motion (the "Lederman Declaration").

## GENERAL BACKGROUND

1.      On January 13, 2017 (the "**Petition Date**"), the Debtor filed its voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").  The factual background regarding the Debtor, including its business operations, its capital and debt structures, and the events leading up to the filing of the Chapter 11 Case, is set forth in the Chern Declaration, filed contemporaneously herewith.

2.      The Debtor continues to manage and operate its business as debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Case, and no committees have been appointed.

3.      As set forth in the Chern Declaration, pursuant to this Motion, the Debtor hereby seeks entry of an order approving certain bidding and sale procedures, the sale of its assets to the highest or otherwise best bidder and certain buyer protections for the stalking horse bidder.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2), the *Amended Standing Order of Reference*

*from the United States District Court for the District of Delaware* dated February 29, 2012 and Rule

9013-1(f) of the Local Rules.

5.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory basis for the relief requested herein is 11 U.S.C. §§ 105 and 363 and

Rules 4001, 6004(h), 7062 and 9014 of the Bankruptcy Rules and Rule 6004-1 of the Local Rules.

## PRELIMINARY STATEMENT

7.      Founded in April 2003 by a team of industry experts, the Company competes in the

physical design segment of the electronic design automation ("**EDA**") industry, developing

technology and manufacturing software solutions for engineers in the physical design of integrated

circuits.  Since its founding, the Company has achieved steady financial growth, becoming a leader

in the EDA field.  As set forth more fully in the Chern Declaration, Synopsys[2] commenced

litigation against the Company, asserting claims for copyright infringement, infringement of four

patents, breach of a license agreement between the parties and breach of the covenant of good faith

and fair dealing.  The litigation on these claims has stretched out for more than three years.

Through a motion to dismiss, the Company successfully limited the scope and extent of Synopsys'

breach of contract claim, and through summary judgment, limited the scope and extent of

Synopsys' copyright infringement claims.  However, in March 2016, after a three-week trial, the

jury found in favor of Synopsys on the remaining copyright claim, which alleged that the

Company's P&R engine product, Aprisa, infringed on copyrighted elements contained in one of

Synopsys' products.  The jury awarded $30.4 million to Synopsys.

8.      The Synopsys Verdict created a significant challenge to the Company's ability to

continue its operations as a going concern.  The Company has taken steps to streamline its

operations, including ceasing any investment into its growth.  After thoroughly considering the

strategic alternatives for the Company, the board of directors decided that pursuing a sale, merger,

---

[2] Capitalized terms not defined herein have the same meaning as ascribed to them in the Chern Declaration.

acquisition and/or related transaction (a "**Transaction**") was in the best interests of the Company, its creditors and equity holders.

9.      As more fully set forth in the Lederman Declaration, in July 2016, the Company retained Cowen and Company ("**Cowen**") as its investment banker to assist in exploring a potential Transaction.  Cowen has engaged in a comprehensive marketing process, among other things, contacting more than one hundred and forty (140) potentially interested parties comprised of both strategic and financial buyers, both in the United States and China.  Cowen scheduled introductory conferences with more than 50 entities.  After the initial conferences, twenty-nine (29) entities expressed continued interest and executed non-disclosure agreements.  (*See* Lederman Dec. ¶ 9).

10.      Cowen continued discussions with these entities and transmitted bid letters and draft asset purchase agreements to 14 entities that continued to express interest, and Cowen established a deadline of October 31, 2016, for interested parties to submit proposals to qualify as a stalking horse bidder.  In response, three parties submitted bids, and others expressed interest but indicated that they were not prepared at the time to commit to submitting a bid.  The board, in consultation with counsel and Cowen, evaluated the three bids, negotiated revisions to the bids and eventually decided to pursue what it considered to be the highest or otherwise best bid.  (*See* Lederman Dec. ¶¶ 10-11).

11.      At the Company's direction, Cowen engaged that bidder in negotiations which culminated in the execution of a letter of intent and the negotiation of substantial terms of an asset purchase agreement.  However, after several rounds of negotiations, the board and the Company determined that certain demands made by the proposed bidder were not in the best interests of the Company and decided to cease negotiations and pursue alternatives.  (*See* Lederman Dec. ¶ 12).

12.      Consequently, the Company turned its focus to another interested party which submitted an attractive bid, Draper Athena ("**Draper Athena**").  Again at the Company's direction, Cowen engaged Draper Athena in negotiations over several days, and, after multiple exchanges of

4

drafts, the Company and Draper Athena executed a Letter of Intent on December 2, 2016.  Under

the Letter of Intent, among other things, Draper Athena required certain conditions to be satisfied

including the Debtor requesting the Court to approve, on an expedited basis, certain bidding and

sale procedures and break-up fee provisions and the closing of a Transaction to Draper Athena by

early March 2017.  (*See* Lederman Dec. ¶ 13).

13.     The Debtor has determined, after considering its alternatives, that maximizing the

value of the Debtor's estate can be best accomplished through a sale (pursuant to a chapter 11 case,

free and clear of liabilities) of the Acquired Assets.

### THE STALKING HORSE BID

14.     On January 10, 2017, after extensive arms'-length, good faith negotiations, the

Debtor has executed a definitive asset purchase agreement (the "**Agreement**") setting forth the

terms and conditions for the sale to and the purchase of the Acquired Assets (the "**Sale**") by a

Delaware corporation to be formed by Draper Athena (the "**Stalking Horse**") pursuant to sections

363 and 365 the Bankruptcy Code, subject to higher or otherwise better bids (the "**Stalking Horse**

**Bid**").[3]  A copy of the Agreement is attached hereto as **Exhibit C** hereto and incorporated by

reference herein.  (*See* Lederman Dec. ¶¶ 14-16).

15.     The Debtor and the Stalking Horse also agreed to the bidding procedures for an

auction, which include a break-up fee and expense reimbursement in the event a higher or otherwise

better bid is consummated.

16.     Because the proposed Transaction would permit the business to be sold as a going

concern and given the extensive marketing efforts undertaken by Cowen and analysis of the offers

received thus far, the Debtor has determined that the Stalking Horse Bid represents the best

opportunity for the Debtor to maximize the value of its estate and serve as a basis for conducting an

---

[3] Frank Chang signed the Agreement for and on behalf of a Delaware corporation to be formed prior to Closing to act as the Purchaser and Draper Athena Management Co. Ltd, a Chinese limited liability company signed in its capacity as a Guarantor of the obligations undertaken by the Stalking Horse in the Agreement.

auction to seek higher or otherwise better offers.

17.     As described above, the Transaction is subject to competitive bidding as set forth in the Bidding Procedures.  Pursuant to the terms of the Agreement, the Stalking Horse has agreed to purchase the Acquired Assets for $8 million in immediately available funds, less certain adjustments based on deferred revenue, plus the assumption of certain post-petition liabilities as specifically set forth in the Agreement.

### RELIEF REQUESTED

18.     By this Motion, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, and Local Rules 2002-1, 6004-1 and 9006-1, the Debtor requests entry of the following:

(a)   the "**Bidding Procedures Order**" substantially in the form attached hereto as **Exhibit B**:

    (1)     authorizing and approving the Bidding Procedures substantially in the form attached hereto as **Exhibit A** in connection with (1) submitting bids for the Acquired Assets and (2) conducting an auction (the "**Auction**") of the Acquired Assets, in the event the Debtor receives at least one additional bid for substantially all of the Acquired Assets;

    (2)     approving the Break-Up Fee and Expense Reimbursement in accordance with the terms and conditions set forth in the Bidding Procedures;

    (3)     scheduling the Auction to be held on ___ __, 2017 at 10:00 a.m. (prevailing Eastern Time) at the offices of **Wilson, Sonsini, Goodrich & Rosati at 1301 Avenue of the Americas, New York, NY 10019**, or at such other place, date and time as may be designated by the Debtor;

    (4)     scheduling a hearing (the "**Sale Hearing**") on March  __, 2017 to consider approval of the Sale;

6

(5)    authorizing and approving the proposed notice of the Bidding Procedures, Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit D** (the "**Sale Procedures Notice**");

(6)    authorizing and approving procedures (the "**Cure Procedures**") to be served on counterparties to the executory contracts (the "**Contracts**") and unexpired leases (the "**Leases,**" and together with the Contracts, the "**Executory Contracts**") that will be assumed by the Debtor and assigned to the successful purchaser(s) of the Acquired Assets, and to resolve any objections thereto;

(7)    authorizing and approving the proposed form of notice to be served on counterparties to Executory Contracts (the "**Cure Procedures Notice Parties**") and the amount that Debtor has determined is necessary to cure any monetary defaults thereunder (the "**Cure Costs**"), substantially in the form attached hereto as **Exhibit "E"** (the "**Cure Notice**"); and

(8)    such other relief as determined by the Court.

(b)    an order in the form attached hereto as **Exhibit "F"** (the "**Sale Order**") authorizing and approving the following:

(1)    the Sale of the Acquired Assets free and clear of all liens, claims, encumbrances and liabilities, except as provided in the agreement with the successful bidder, with such claims to attach to the proceeds of the Sale in the same amount and order of priority as such liens attached to the Acquired Assets;

(2)    authorizing the Debtor to consummate the Sale and all documents, agreements and contracts executed in conjunction therewith; and

(3)    granting such other relief as determined by the Court.

**PROPOSED BIDDING AND SALE PROCEDURES**

<u>The Purchase Agreement</u>

19.    A summary of the principal terms of the APA, including terms that are required to be

highlighted pursuant to Local Rule 6004-1, is as follows:

| | |
|---|---|
| **Purchaser** | Special purpose entity to be formed by Draper Athena.  Draper Athena Management  Co. Ltd is the guarantor of the of the obligations undertaken by the Stalking Horse in the Agreement. Agreement, Recitals, §§ 2.1, 7.8 |
| **Purchase Price** | $8,000,000 less Adjusted Deferred Gross Revenue as defined in the Agreement Agreement, §2.2(a) |
| **Purchased Assets** | Substantially all assets of the Debtor Agreement, §2.1 |
| **Excluded Assets** | Excluded assets include all Contracts not assigned to purchaser, cash and cash equivalents, all assets in trust for purpose of funding Benefit plans, Agreement, §2.1(c) |
| **Assumed Liabilities** | All liabilities under the Designated Contracts to the extent arising after the Closing; and any obligations related to the continued use of Intellectual Property Rights after the Closing as determined in a final judgment in connection with the Synopsys Patent Litigation. Agreement, §2.1(d) |
| **Excluded Liabilities** | All liabilities of the Debtor arising prior to Closing, all liabilities arising out of any Excluded Asset, all Employment Liabilities, any restructuring fees, all liabilities of Debtor arising from complaints instituted prior to the Closing except any obligations related to the continued use of Intellectual Property Rights after the Closing as determined in a final judgment in connection with the Synopsys Patent Litigation, any taxes of Seller including any Taxes related to the Transferred Assets to the extent attributable to taxable periods |

| | |
|---|---|
| | (or portions thereof) ending on or prior to the Closing Date.<br><br>Agreement, § 2.1(e) |
| **Termination** | Agreement can be terminated by (i) written mutual consent; (ii) by either Purchaser or Seller, if the Closing shall not have occurred on or before 11:59 p.m. (Pacific time) on the Outside Date (May 31, 2017); (iii) by either Purchaser or Seller if a Government Entity shall have issued a regulation or order which has the effect of preventing the Transaction; (iv) by either the Purchaser or Seller if the Court approves an Alternative Transaction; (v) by Purchaser in the event of a breach of any obligation, warranty or representation by the Seller; (vi) if a trustee is appointed and such trustee rejects the Transaction; |
| **Agreements with Management** | None |
| **Sale to Insider** | None |
| **Releases** | Debtor releases, effective as of the Closing Date, all claims against Purchaser, except those obligations arising under the Agreement.<br><br>Sale Order, Para. 14 |
| **Auction to be Conducted** | Yes, in the event there are Qualified Bids other than the Stalking Horse Bid<br><br>Bidding Procedures, Art. VI |
| **Closing and Other Deadlines** | Closing must occur on or prior to May 31, 2017<br><br>Agreement, § 10.1(b) |
| **Good Faith Deposit** | Stalking Horse deposit is in the amount of $800,000, payable within 10 days of the entry of the Bidding Procedures Order<br><br>Bidding Procedures, Art. IV, A. 2. |
| **Interim Arrangements with Proposed Purchaser** | Not applicable, Debtor to conduct the Business in the ordinary course consistent with past practice<br><br>Agreement, Sec. 5.1 |
| **Use of Proceeds** | No restriction on use of sale proceeds |
| **Record Retention** | Seller shall have continued use of records for purposes of administering the Bankruptcy Case, including claims against |

|  | Seller.<br><br>Agreement, § 2.1 (a)(v). |
|---|---|
| **Sale of Avoidance Actions** | Avoidance Actions are not included in the Acquired Assets |
| **Rule 6004(h)** | The Sale order provides relief from Bankruptcy Rule 6004(h)<br><br>Sale Order, Para. 51 |

20.    The Stalking Horse proposes to acquire the Acquired Assets, which are all the assets used by the Debtor in its business, including, without limitation, customer agreements, accounts receivable, foreign subsidiaries and intellectual property, including software code, through the Sale pursuant to section 363 of the Bankruptcy Code.  The Stalking Horse acknowledges that its offer to purchase the Acquired Assets on the terms and conditions set forth in the Agreement will be subject to higher or otherwise better bids pursuant to an auction process as authorized by the Bankruptcy Court and conducted in accordance with the Bidding Procedures Order.  The Acquired Assets may be sold to one or more higher or otherwise better bidders (such transaction, if consummated by a party other than the Stalking Horse, an "**Alternative Transaction")** pursuant to the Bidding Procedures Order.

<u>Terms of Sale</u>

21.    The Debtor seeks approval of the Sale to the Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims, interests, and encumbrances to attach to the proceeds of the Sale (the "**Sale Proceeds**") with the same validity and priority as they attached to the Acquired Assets prior to the Sale.  The Debtor seeks an order of the Court prohibiting all persons holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against the Purchaser as authorized by section 363(f) of the

Bankruptcy Code.  The Debtor will submit and present additional evidence, as necessary, at the Sale

Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's estate

and all its stakeholders, and satisfies the standards necessary to approve a sale of substantially all of

a debtor's assets articulated by the Court of Appeals for the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc*., 788 F.2d 143 (3d Cir. 1986).

The Bid Procedures

22.     In accordance with Bankruptcy Rule 6004(f)(l), sales of property outside the

ordinary course of business may be by private sale or by auction.  The Debtor believes that good

cause exists to expose the Purchased Assets to sale at an auction and to approve the procedures

proposed herein.  An auction conducted substantially in accordance with the Bidding Procedures

will enable the Debtor to obtain the highest and best offers for the Purchased Assets, thereby

maximizing the value for the estates.

23.     The Debtor will permit existing interested parties and any new prospective

purchasers to perform reasonable due diligence with respect to the Purchased Assets and will assist

them with such efforts.  This process will culminate in an Auction before the Sale Hearing, at which

time a sale of the Purchased Assets will be submitted to the Court for its approval.

24.     Subject to this Court's approval, the Debtor and the Stalking Horse have set forth the

Bidding Procedures attached as Exhibit A to govern the process by which the Debtor will solicit and

choose Qualified Bidders (as defined in the Bidding Procedures) and conduct an auction of the

Acquired Assets.  The procedures are set forth in full in Exhibit A attached hereto[4] and are

summarized below.  While all interested bidders should read the Bidding Procedures in their

entirety, the following describes the salient points of the Bidding Procedures and discloses certain

information required pursuant to Local Rule 6004-1:

---

[4]   The Bidding Procedures are also attached to the Agreement as Exhibit "C-1".

| | |
|---|---|
| **Provisions Governing Qualifications of Bidders** | A Bid must include detailed, written evidence sufficient to the Seller demonstrating that the Potential Bidder has and will continue to have the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia*, (a) contact names and numbers for verification of financing sources; (b) sufficient information as requested by the Seller and its advisors to allow them to determine, in their sole discretion, that such Potential Bidder has the financial wherewithal to consummate a Sale; and (c) the Potential Bidder's current financial statements (audited, if existing) or other similar financial information reasonably acceptable to the Seller.<br><br>Bidding Procedures, Art. 4. A. 11 |
| **Provisions Governing Qualified Bids** | Bid must include, *inter alia,* the following (a) the purchase price for all or substantially all of the Acquired Assets which must be greater than the sum of $8,000,000 plus the Break-Up Fee and the Expense Reimbursement (the "**Auction Baseline Bid**"); (b) a deposit equal to 10% of the total cash and non-cash consideration; (c) be on same or better terms than the Stalking Horse Bid; (d) a signed bid by an authorized representative and include an alternative purchase agreement marked against the Agreement; (e) must identify the Designated Contracts and Assumed Liabilities (f) must set forth each regulatory and third party approvals required for consummation of the Alternate Transaction; (g) must not contain representations or warranties more onerous than the Stalking Horse Bid and cannot be contingent on financing or third party approvals.<br><br>Bidding Procedures Art. IV. A. |
| **Bid Deadline** | March 13, 2017 |
| **Provisions Governing Auction** | If one or more Qualified Bids (other than the Stalking Horse Bid) are received, the Debtor will conduct an Auction.  The minimum Overbid after and above the Auction Baseline Bid shall be made in increments of $100,000.  The Debtor reserves the right to modify this amount.  The Auction shall conclude when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of its Successful Bid.<br><br>Bidding Procedures, Art. V |

| | |
|---|---|
| **Selection of Successful Bid** | The Debtor, in consultation with the Consulting Parties, shall have discretion to determine the Prevailing Highest Bid after each Overbid Round and the Successful Bidder following the close of the Auction.<br><br>Bidding Procedures, Art. VI. E. |
| **Closing with Alternative Back-Up Bidders** | If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction with respect to all or substantially all of the Transferred Assets, as determined by the Seller, will be designated as the backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be The Deposit of the Successful Bidder will be applied to the purchase price at the closing. The Deposits for each Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder will be returned within three (3) business days after the close of the Auction required to keep its last submitted Bid (the "**Backup Bid**") open and irrevocable until the earlier of the closing of the transaction with the Successful Bidder or the Outside Date.<br><br>Bidding Procedures, Art. V |
| **Return of Deposits** | The Deposit of the Successful Bidder will be applied to the purchase price at the closing. The Deposits for each Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder will be returned within three (3) business days after the close of the Auction.<br><br>Bidding Procedures, Art. VI, Section E. |

25.     The Bidding Procedures seek to provide a fair opportunity for the Debtor and its professionals to solicit and receive bids from Potential Bidders while providing a time frame for the closing of a Transaction consistent with the Debtor's resources and ability to continue its business operations.  In that regard, the Debtor will (i) coordinate the efforts of Potential Bidders (as defined in Exhibit B) in conducting their due diligence investigations; (ii) receive offers from Potential Bidders; (iii) determine whether any person is a Qualified Bidder; and (iv) conduct the Auction and further negotiate any offers made to purchase the Acquired Assets.

26.     To become a Qualified Bidder, a Potential Bidder must, among other things, include

with its bid a cash deposit equal to ten percent (10%) of the aggregate cash and non-cash
consideration of the bid, *provided that* the deposit of the Stalking Horse will be due not later than
ten (10) business days after the Court enters the Bidding Procedures Order.  The bid shall be on
terms that the Debtor believes are substantially the same or better than the Stalking Horse Bid,
include substantially all of the assets of the Debtor and have a minimum bid greater than the sum of
(i) $8 million plus (ii) the Expense Reimbursement, plus (iii) the Break-Up Fee (the **"Auction
Baseline Bid"**).  A Potential Bidder must also include with its bid, financial and other information
sufficient to constitute adequate assurance of future performance of the applicable obligations under
any Contracts to be assumed and assigned to it.  The Stalking Horse will be deemed to be a
Qualified Bidder.

27.     In the event there are Qualified Bidders in addition to the Stalking Horse Bid, the
Debtor will conduct an auction.  Any Overbid for all or substantially all of the Acquired Assets after
and above the Auction Baseline Bid shall be made in increments valued at not less than $100,000
(or such other amount as shall be announced at the Auction) in cash or in cash equivalents.

Procedures for Assumption and Assignment of the Assumed Contracts

28.     To facilitate and affect the sale of its assets, the Debtor seeks authorization pursuant
to Section 365 of the Bankruptcy Code to assume and assign certain Executory Contracts related to
the Acquired Assets, as designated by the Successful Bidder.

29.     The Agreement provides that the Debtor will pay, at Closing, the Cure Amounts, as
determined by the Court, if necessary, to cure all defaults, including actual or pecuniary losses that
have resulted from defaults under the relevant Executory Contracts.

30.     The Debtor proposes to file with the Court and serve a Cure Notice on each Cure
Procedures Notice Party with respect to each Executory Contract sought to be assumed and
assigned, which will set forth the Debtor's good faith calculations of Cure Costs with respect to
each with respect to each Executory Contract listed on such notice.  In the event a counterparty

needs additional information, the Debtor will reasonably cooperate with the counterparty regarding the Debtor's calculation of Cure Costs.  Counterparties will have an opportunity to object to the proposed assumption and assignment of their Executory Contracts prior to Sale Hearing.  The following is a summary of the assumption and assignment procedures.

31.     No less than twenty-one days prior to the Bid Deadline, the Debtor will file with this Court and serve on each non-Debtor counterparty to an executory contract or unexpired lease related to the Assets the Cure Notice, substantially in the form attached to the Bidding Procedures Order.  The Cure Notice shall:

      a.  state the cure amounts, if any, that the Debtor believes are necessary to assume such contracts or leases pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**");

      b.  notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Successful Bidder of the Assets at the conclusion of the Auction;

      c.  state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtor; and,

      d.  state the Contract Rejection Deadline (as defined below) by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s) (such objection, a "**Contract Objection**"); *provided, however*, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or unexpired lease or that it will, in fact, be assumed and assigned in connection with the Sale of the Assets.  If no Cure Amount is listed, the Debtor believes that no amount to cure defaults under the respective executory contract or unexpired lease is owed by it thereunder.  The Debtor reserves all of its rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

32.     All Contract Objections, if any, must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, and served on counsel for the Debtor, counsel for the Stalking Horse, the Office of the United States Trustee, and counsel to any Official

Committee (the "**Notice Parties**") so as to be received by the **Contract Objection Deadline**, as defined in the Cure Notice.

33.     Any Contract Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

34.     Any Contract Objection solely to the Cure Amount(s) shall not prevent or delay the Debtor's assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s), the Debtor may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtor can, without further delay, assume and assign such contract(s) or lease(s) to the Successful Bidder.  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

35.     If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

36.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder other than the Stalking Horse under the applicable executory contract(s) or unexpired lease(s) (an "**Adequate Assurance Objection**" and together with a Contract Objection, an "**Objection**"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Notice Parties, the Stalking Horse and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is filed with the Court and received by the Notice Parties, the Stalking Horse and the

16

applicable Qualified Bidder(s) on or before the **Adequate Assurance Objection Deadline**, as such

term is defined in the Cure Notice.

37.    To the extent that any non-Debtor counterparty does not timely file and serve a

Contract Objection as set forth above, such counterparty will be:  (i) deemed to have consented to

the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from

asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or

unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable

assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and

(iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

<u>Stalking Horse Protections</u>

38.    The Debtor is seeking approval of a Break-Up fee in the amount of $400,000, which

is approximately 5.0% of the purchase price for the Acquired Assets.  In addition, the Debtor seeks

approval of an Expense Reimbursement to the Stalking Horse in the maximum amount of $600,000

in the event the Stalking Horse Bid is not approved.

## BASIS FOR REQUESTED RELIEF

### A.  The Sale of the Acquired Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment

39.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the

ordinary course of business may be by private sale or public auction.  The Debtor has determined

that the Sale of the Acquired Assets by public auction will enable the Debtor to obtain the highest or

otherwise best offer for the Acquired Assets (thereby maximizing the value of the estate) and is in

the best interests of the Debtor and its stakeholders.  In particular, the Agreement is the result of

comprehensive arms' length negotiations for the Sale of the Acquired Assets, and the Sale, subject

to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtor's

estate than would be provided by any other existing alternative.

40.    Section 363(b)(1) of the Bankruptcy Code provides: "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

41.    Virtually all courts have held that approval of a proposed sale of the debtor's assets under section 363(b) of the Bankruptcy Code prior to confirmation of a plan of reorganization is appropriate, if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that court may consider the following non-exclusive list of factors in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); *Titusville Country Club V. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 391 (6th Cir. 1986).

42.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) that the terms of the sale have been negotiated in good faith. *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel*

*Corp.,* 82 B.R. at 335-36; *see also Stephens Indus.,* 789 F.2d at 390*; In re Lionel Corp.,* 722 F.2d at 1071.

43.     The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the estate.  *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods*., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), affirmed in part and reversed in part on other grounds, 983 F.2d 336  ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

44.     The Debtor submits that entry into the Agreement is a sound exercise of the Debtor's business judgment because: (a) the Agreement provides for the sale of the Debtor's business as a going concern, thereby maximizing the sale value, as compared to liquidating its assets on a piecemeal basis and (b) it allows certain employees to continue employment by the Successful Bidder.

## B.  Sale of the Acquired Assets Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests

45.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell

and transfer the Debtor's right, interest and title in the Acquired Assets to the Successful Bidder (whether the Stalking Horse or another party) free and clear of all liens, claims, encumbrances, and interests, except as set forth in the Agreement, with such liens, claims, encumbrances, and interests, to attach to the proceeds of the sale of the Acquired Assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.

## C. The Assumption and Assignment of the Assumed Contracts and the Procedures for Assumption and Assignment Should Be Authorized

46.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may be overturned only if decision is product of bad faith, whim or caprice); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

47.     Because the Debtor's business is being sold as a going-concern, the Successful Bidder will determine which Executory Contracts to be assumed and assigned to it.  Therefore, the Debtor's determination regarding assumption is a sound exercise of business judgment, because the Debtor will be complying with the agreement that is maximizing the value of the Acquired Assets. Given that consummation of a Sale of the Acquired Assets is essential to maximize value of the Debtor's estate, assumption of the specified Contracts in compliance with the purchase agreement

of the successful bidder constitutes a sound exercise of business judgment.

48.    Any sale transaction consummated by the Debtor will be contingent upon the

Debtor's compliance with the requirements of section 365 of the Bankruptcy Code, including

pursuant to 365(b)(1) of the Bankruptcy Code, curing any outstanding defaults under the Executory

Contracts to be assumed or providing adequate assurance that such defaults will be promptly cured.

The Debtor's assumption and assignment of the Executory Contracts will be contingent upon

payment or reserve of Cure Costs and effective only upon the closing of the Sale.

49.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an

executory contract if "adequate assurance of future performance by the assignee of such contract or

lease is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future

performance" depends on the facts and circumstances of each case, but should be given "practical,

pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R.

524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440

(Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute

assurance that debtor will thrive and pay rent*).*  Among other things, adequate assurance may be

provided by evidence of the assignee's financial health and experience in managing the type of

enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986)  (adequate assurance of future performance satisfied when prospective assignee of

lease has financial resources and expressed willingness to devote sufficient funding to business to

give it strong likelihood  of  succeeding;  for leases, the chief determinant of adequate assurance is

whether rent will be paid).

50.    As discussed in the Bidding Procedures, in order for a Potential Bid to be designated

as a Qualified Bid, a Potential Bidder must include with its bid, financial and other information

sufficient to constitute adequate assurance of future performance of the applicable obligations under

any Contracts to be assumed and assigned to it.  Based on the foregoing, the Debtor's assumption

and assignment of the designated Contracts satisfies the requirements under section 365 of the

Bankruptcy Code and should be approved.

51.      In order to facilitate the assumption and assignment of the designated Executory

Contracts, the Debtor requests the Court to hold that all anti-assignment provisions, whether express

or implied, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

### D. The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Acquired Assets

52.      As noted above, the paramount goal in any proposed sale of estate property is to

maximize the proceeds received by the estate.  Courts uniformly recognize that procedures intended

to enhance competitive bidding are consistent with the goal of maximizing the value received by the

estate and are, therefore, appropriate bankruptcy sales.  *See, e.g., In re Fin'l News Network, Inc.*,

126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . .

[should] provide an adequate basis for comparison of offers, and [should] provide for a fair and

efficient resolution of bankrupt estates").

53.      Procedures to dispose of assets, similar to the proposed Bidding Procedures, have

been approved in other bankruptcy cases.  *See, e.g.*, *In re IMRIS, Inc.*, Case No. 15-11133 (CSS)

(Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del. Nov. 20,

2013); *In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. Jul.

8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D. Del. Sept. 14, 2011); *In

re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); *In re East West

Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); *In re

Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05-

44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive, Inc.*, Case No. 04-74377 (Bankr.

E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec.

6, 2006).

54.     The Debtor believes that the Bidding Procedures will establish a test of the value of the Acquired Assets.  Such procedures will increase the likelihood that the Debtor's estate will receive the greatest possible consideration for its assets, because the procedures will ensure a fair and competitive bidding process.  They also provide for an Auction of the Acquired Assets in an expeditious and efficient manner, which the Debtor believes is essential to maximizing the value of the estate for its stakeholders.

55.     The Debtor also believes that the proposed Bidding Procedures will promote active bidding from interested parties and will dispel any doubt as to the best or otherwise highest offer reasonably available for the Acquired Assets.  In particular, the proposed Bidding Procedures will allow the Debtor to conduct an Auction in a controlled, fair, and open manner that will encourage participation by financially capable bidders who demonstrate the ability to close the Sale of the Acquired Assets.  Further, the Bidding Procedures provide the Debtor with the opportunity to consider all Qualified Bids and to select, in its reasonable business judgment, and after consultation with its professionals and any official committee, the highest or otherwise best offer(s) for the Acquired Assets.  Moreover, the Bidding Procedures provide the Debtor with the flexibility to address unanticipated developments at the Auction, while ensuring that the propriety of the procedures endures.

56.     Accordingly, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtor' sound business judgment and should be approved.

**E.  The Proposed Break-Up Fee Is Reasonable and Appropriate, and Will Maximize Value for Stakeholders by Providing an Incentive for the Stalking Horse to Submit a Binding Offer**

57.     The Agreement provides for a Break-Up Fee of $400,000 and a maximum Expense Reimbursement of $600,000 (the Break-Up Fee and the Expense Reimbursement are referred to

herein collectively as the "**Stalking Horse Buyer Protections**").[5]  Although the parties recognize

that, as percentage of the purchase price, the Stalking Horse Buyer Protections may be outside of a

percentage of a purchase price, under the unique circumstances of this Sale, they nevertheless are

reasonable and consistent with the Debtor's business judgment, and should be approved.

58.     The Third Circuit Court of Appeals has clarified the standard for determining the

appropriateness of bidding incentives in the bankruptcy context.  In *Calpine Corp. v. O'Brien Envtl.*

*Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999).  Specifically, the

Third Circuit has held that even though bidding incentives are measured against a business

judgment standard in non-bankruptcy transactions, the administrative expense provisions in section

503(b) of the Bankruptcy Code govern post-petition expenditures in bankruptcy cases.

Accordingly, to be approved, bidding incentives such as the Break-Up Fee and Expense

Reimbursement must provide a benefit to a debtor's estate.  *Id.* at 533.  Benefits to the debtor's

estate may be found where "assurance of a break-up fee promoted more competitive bidding, such

as by inducing a bid that otherwise would not have been made and without which bidding would

have been limited" and where the availability of the break-up fees and expenses "were to induce a

bidder to research the value of the debtor and convert that value to a dollar figure on which other

bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect its

true worth." *Id.* at 537.

59.     The circumstances of this Sale are particularly unique and challenging due to the

ongoing Synopsys Litigation, which is directed not only at the Debtor, but at the Acquired Assets

themselves.  Performing the diligence on a complex multi-year intellectual property litigation like

---

[5]  In the event that the Expense Reimbursement becomes payable, Purchaser is required to send an Approval Request to the Seller with a copy to the UST and any committee counsel with a reasonably detailed summary of the actual out-of-pocket costs and expenses incurred by Purchaser and sought for reimbursement.  Seller shall pay all non-disputed items and resolve any disputed items in a commercially reasonable manner.  Presumably, the Court would resolve any disputes that could not be settled by the parties.

the Synopsys Litigation was an enormous task in its own right.  In addition to understanding the

historical posture and risks of the Synopsys Litigation, parties interested in purchasing the Acquire

Assets, including the Stalking Horse, recognize that given the history of litigation between the

Debtor and Synopsys it is foreseeable that there will be ongoing disputes with Synopsys in this

Chapter 11 Case, including the potential for disputes regarding the Acquired Assets.  As a result, the

amount of diligence and potential for ongoing costs go well beyond what could be expected in a

typical transaction of this size.[6]

60.    Without the benefit of the Stalking Horse Buyer Protections, the Stalking Horse

would have been unwilling to commit to proceed with a transaction with the costly and burdensome

diligence process and risk present here, given the uncertainty whether it would prevail as the

Successful Bidder.  The Stalking Horse Buyer Protections, therefore, are a necessary incentive to

induce the Stalking Horse into committing to the Sale process and to purchasing the Acquired

Assets for a price that the Debtor believes is fair consideration.

61.    The Stalking Horse Buyer Protections have a direct and meaningful benefit to the

Debtor and its estate.  By inducing the Stalking Horse to enter into the Agreement, a baseline bid

for subsequent interested purchasers is set.  Importantly, the Stalking Horse's commitment to the

purchase of the Acquired Assets signals to the market that the Synopsys Litigation has not rendered

the Acquired Assets toxic, increasing their value in the eyes of Potential Bidders for the ultimate

benefit of the Debtor's estate and its stakeholders.  Indeed, the Debtor believes that the parties

prepared an agreement that covers most, if not all, of the issues faced by Potential Bidders, which

---

[6] In order to complete the Transaction, the Stalking Horse will also need to comply with regulations issued by and obtain approval from the Committee on Foreign Investment in the United States ("**CFIUS**") prior to the hearing date on the Sale Motion.  CFIUS is an inter-agency committee under the Treasury Department which is authorized to review transactions that could result in control of a U.S. business by a foreign person in order to determine the effect of such transactions on the national security of the United States.  The process involves filing a notice with CFIUS in the form and content as set forth in the regulations and responding to issues or questions raised.  The Stalking Horse is also required to provide two certifications, one at the beginning of the process and the second at the end, attesting to the truth of the matters set forth in the CFIUS notices.  Compliance with CFIUS has added significant expense to the Stalking Horse.

the other Potential Bidders now can use to their benefit as a template for a Qualified Bid.

62.    The Debtor's payment of the Break-Up Fee and Expense Reimbursement under the conditions set forth in this Motion, therefore, is (a) an actual and necessary cost of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtor's estate and its stakeholders, (c) reasonable and appropriate and (d) necessary to ensure that the Stalking Horse will continue to pursue the proposed Agreement.  Accordingly, the buyer protections constitute administrative expenses with priority pursuant to Bankruptcy Code section 503(b), and should be approved by the Court.

## F.    The Successful Bidder Should Be Granted the Protection of Bankruptcy Code Section 363(m)

63.    As will be set forth in further detail at the Sale Hearing, the Debtor also maintains that the Successful Bidder is entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

## G.    The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy   Code Section 363(n)

64.    As set forth above, the Debtor and the Stalking Horse negotiated the sale of the Acquired Assets at arm's length and in good faith.  The Debtor will provide evidence, if necessary, that the sale of the Acquired Assets is not the result of collusion or other bad faith by the bidders.  If necessary, the Debtor will provide evidence that the purchase price has not been controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

65.    As will be set forth in more detail at the Sale Hearing, the Sale has been negotiated, proposed, and entered into without collusion, in good faith, and was negotiated from arm's-length positions.  None of the Debtor, the Stalking Horses nor the Successful Bidder has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.

**H.  Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(h) and 6006(d)**

66.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

67.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes do not provide specific guidance when a court should "order otherwise" and eliminate or reduce the 14-day injunction period, commentators agree that the 14-day period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally Collier on Bankruptcy* P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

68.     Pursuant to the Agreement, and due to potentially diminishing value of the Acquired Assets, the Debtor must close this sale promptly.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**NOTICE**

69.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) those creditors holding the 30 largest unsecured claims against the Debtor's estate; (c) counsel for the Stalking Horse and Guarantor; (d) counsel to parties whose Executory Contracts will be assigned to the Successful Bidder; (e) counsel for Silicon Valley Bank; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits

that no other or further notice need be provided.

## NO PRIOR REQUEST

70.     No prior request for the relief sought herein has been made to this Court or to any other court.

WHEREFORE, the Debtor respectfully requests entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit B,** granting the relief sought in the Motion and such other and further relief as the Court deems just and proper.

Dated:  January 17, 2017

**DORSEY & WHITNEY (DELAWARE) LLP**

*/s/ Robert W. Mallard*
Eric Lopez Schnabel (DE Bar No. 3672)
Robert W. Mallard (DE Bar No. 4279)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
             mallard.robert@dosey.com

DORSEY & WHITNEY LLP
Janet M. Weiss
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  weiss.janet@dorsey.com

***Proposed Attorneys for ATopTech, Inc.***