## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| **ATOPTECH, INC.,** | Case No. 17-10111 (MFW) |
| Debtor.[1] | |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105, 363(B) AND 503(C) OF THE BANKRUPTCY CODE

ATopTech, Inc. (the "Debtor" or the "Company"), the debtor and debtor in possession in this bankruptcy case, hereby files this motion (the "Motion") requesting authority for the Debtor to adopt and implement a proposed Key Employee Retention Program (the "KERP") and a Key Employee Incentive Program (the "KEIP") as set forth below.

The Motion is based on the information set forth herein, the DECLARATION OF JUE-HSIEN CHERN IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF [Docket No. 3] (the "Chern Declaration") filed on January 13, 2017, and (i) the DECLARATION OF CLAUDIA CHEN IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105, 363(B) AND 503(C) OF THE BANKRUPTCY CODE (the "Chen Declaration"), attached hereto as **Exhibit "D"**, (ii) the DECLARATION OF SANG WANG IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105, 363(B) AND 503(C) OF THE BANKRUPTCY CODE (the "Wang Declaration"), attached hereto as **Exhibit "E"** (iii) the DECLARATION OF LORIE BEERS IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105, 363(B) AND 503(C) OF THE BANKRUPTCY CODE (the "Beers Declaration"), attached hereto as **Exhibit "F",** and (iv) the DECLARATION OF RANDY

---

[1] The last four digits of the Debtor's federal tax identification number are 1945. The Debtor's headquarters and mailing address is 2111 Tasman Drive, Santa Clara, CA 95054.

LEDERMAN IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105, 363(B) AND 503(C) OF THE BANKRUPTCY CODE (the "Lederman Declaration"), attached hereto as **Exhibit "G"**, all filed concurrently herewith, the pleadings and papers on file herein, and such other oral or documentary evidence as may be submitted before the Court.

In support of the Motion, the Debtor respectfully represents the following:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the AMENDED STANDING ORDER OF REFERENCE FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 363(b) and 503(c).[2]

## SUMMARY OF RELIEF SOUGHT

3.      By this Motion, the Debtor seeks entry of an order substantially in the form attached hereto as **Exhibit "A"** authorizing the Debtor to adopt and implement the Company's pre-petition (a) KERP, the terms of which are set forth on **Exhibit "B"** hereto and incorporated herein by reference for certain non-insider employees and (b) KEIP, the terms of which are set forth on **Exhibit "C"** hereto and incorporated herein by reference.  The Debtor believes in its business judgment, that the KERP and the KEIP (together, the "Compensation Programs") both are necessary to retain and incentivize critical employees to continue to perform at a high-level, without distraction, while performing services beyond the duties required by their positions, in order to maintain and maximize the going concern value of the Company's business pending the sale of its assets for the benefit to creditors of the bankruptcy estate.

---

[2] Unless otherwise specified, all statutory references herein are to Title 11 of the United States Code (the "Bankruptcy Code").

**BACKGROUND**

4.     On January 13, 2017 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is presently operating its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108.

**A.     Factual Overview**

**1.     Relevant Background**

5.     The Company's background, business and financial information, as well as the events precipitating the commencement of this bankruptcy case are set forth in the Chern Declaration.

6.     As detailed in the Chern Declaration, in March 2016, a jury in the Northern District of California case *Synopsys, Inc. v. ATopTech, Inc.*, Case No. 13-02965-SC (the "Synopsys Action") awarded a $30.4 million verdict (the "Synopsys Verdict") to Synopsys Inc. ("Synopsys") against the Company.  However, a judgment was not entered against the Company because a number of issues and claims remained unresolved, including a bench trial on the Company's equitable estoppel defense, which was decided in favor of Synopsys in October 2016, and various patent and antitrust claims which remain pending.

**2.     The Pre-Petition Bonus Plan**

7.     Notwithstanding the Synopsys Verdict, the Company's business has thrived over the past several years, with steadily increasing revenues and positive EBITDA, in addition to a strong customer and partner base; however, the Company also was aware that the Synopsys Verdict and the level of damages awarded thereunder would lead to unease within its workforce and could create significant issues for its ability to continue operations as a going concern and therefore that it might need to consider strategic alternatives.  For these reasons, in addition to the Company's belief that its defenses and counterclaims in the Synopsys Action were strong, the Company was compelled to take measures to maintain employee and consumer confidence and to protect its value while continuing to litigate the Synopsys Action.  Consequently, in April 2016, the Company's board of directors (the "Board") met with its executives to outline an

3

4819-4741-0496/2

employee bonus plan (the "Pre-Petition Bonus Plan") to ensure their retention during the times of uncertainty in the wake of the Synopsys Verdict.

8.       In developing the Pre-Petition Bonus Plan, the Board engaged in a comprehensive process to ensure that it would be fair and feasible within the Company's financial constraints and industry market standards, while ensuring that it would accomplish its goal – to prevent employees from departing the company.  In order to ensure an equitable and impartial process, the Board's compensation committee (the "Compensation Committee") comprised of three independent members, all of whom are vastly-experienced tech executives who have successfully founded, managed, grown, and sold technology companies and/or took them public, including companies in the chip design industry, led the development of the Pre-Petition Bonus Plan.  Sang Wang acted as the head of the Compensation Committee.  He possesses extensive experience serving on boards of industry tech companies, including the boards of Altos Design Automation and Anchor Semiconductor, in addition to the non-profit organization at Stanford University International Student Christian Outreach, all on which he currently sits.  Previously, he also served on the boards of organizations and companies including the Electronic Design Automation Consortium, EPIC, Nassda, Synopsys, Stanza, Gambit, Plato and Virage Logic, Golden Gate Technology, Nanovata, Silicon Frontline Technology and Ponte Solutions.

9.       The other Compensation Committee members are Wu Fu Chen and Dr. Jackson Hu.  Mr. Chen is the Chairman of the Company's Board and also is a partner at Dragon Investment Fund, a leading technology transfer, business accelerator, and investment fund source based in Taiwan.  He has started more than a dozen companies, and co-founded many successful ventures, including Cascade Communications (where he held the position of vice president of engineering), Arris Networks (where he acted as chairman and CEO), Ardent Communications, Navini Networks and Shasta Networks.  Mr. Hu possesses over three decades of experience within the semiconductor industry and has been the Chairman and CEO of NeoEnergy Microelectronics since May 2009.  Prior, he served as CEO and chairman of UMC, president and CEO of SiRF Technologies and senior vice president and general manager of S3.  He also was a

4

co-founder of both Verticom (acquired by Western Digital) and of IC Ensemble (acquired by Via Technology).

10.     In addition to the three Compensation Committee members, the company's corporate counsel Wilson Sonsini Goodrich & Rosati, P.C. attended Compensation Committee meetings and provided guidance and counsel with respect to legal questions and issues relating to the formulation of the Pre-Petition Bonus Plan.  Therefore between the three members of the Compensation Committee and the Company's corporate counsel, these meetings were conducted and attended by professionals with a vast amount of experience managing people and leading companies within the industry sector.

11.     Over the course of several weeks, the Compensation Committee met independently, and also with Company executives and the entire Board.  They carefully evaluated all facets of the Company's operations and pinpointed three integral business aspects centered around (a) research and development, (b) customer support and marketing and (c) sales and administration, which they determined should be enhanced and at minimum should be fully preserved in order to maintain and maximize value of the business.  These three workforce components comprise the foundation of the Company's business and its potential for continued growth and existence.  The employees within these components perform the development of technologies and products, the marketing and sales of products, the technical and usage support for customers, and the overall administration and management of operations.  Without them, the Company would not be able to operate.

12.     The Compensation Committee, again both independently and with the entire Board and Company executives, also examined the Company's employee roster to ascertain a group of employees, including some executives, who possess specific experience and knowledge of, among other things, the Company's intellectual property, equipment, data systems, internal operations and customer base, who had established relationships with key customers and vendors, and who were critical to the continued success of the Company.

13.     After the comprehensive process described above and consideration of potential

5

terms for the bonus plan, while drawing on its members' considerable experience with comparable compensation plans within the industry, the Compensation Committee recommended to the Board that it adopt the terms of the Pre-Petition Bonus Plan.  In April 2016, the Board adopted a resolution approving the Pre-Petition Bonus Plan, and it became effective.  In October 2016, the Board approved the addition of an additional executive employee, Eric Thune, under the Pre-Petition Bonus Plan.

14.     Under the Pre-Petition Bonus Plan, the Company agreed (a) to pay a cash bonus (a "<u>Bonus Plan Payment</u>") ranging from $10,000 to $150,000, to 37 employees, and aggregating to $2,035,000, in two equal installments in October 2016[3] and April 2017, or otherwise upon a change of control[4], contingent on the continuing employment of each employee at the time of payment, which agreement was memorialized in letter agreements to each eligible employee.

15.     In October 2016, as the Company approached its decision to effect a sale of its assets and commence this bankruptcy case, its executives, advisors, Board and the Compensation Committee again met to revisit the Pre-Petition Bonus Plan to ensure that it would still accomplish its initial goals with respect to its workforce but while operating within the unique context of a chapter 11 bankruptcy case, a section 363 sale and applicable law.  After extensive deliberation, the Company determined that (a) its status as a debtor in possession in bankruptcy, in addition to the Synopsys Verdict and ongoing litigation, would  increase the risk of employees departing the Company, (b) it needed to minimize any departures from its workforce in order to maximize interest to potential bidders and value as a going concern, and (c) its insider executives should be required to meet specified goals to ensure the success of a sale and the bankruptcy case in order to receive their Bonus Plan Payments.  After several meetings, on November 3, 2016, the Board adopted a resolution to retain the Pre-Petition Bonus Plan but with two revisions: (a) an increase in the number of employees eligible to participate in the program and (b) the

---

[3] Pursuant to the terms of the Pre-Petition Bonus Plan, the Company paid the first installment of Bonus Plan Payments in the beginning of October 2016.  The first installment to Mr. Thune has not vested and has not been paid.

[4] The terms of the agreement to pay a Pre-Petition Bonus to Mr. Thune provide that such bonus does not become due until February 2017 and June 2017, or otherwise upon a change of control.

specification of criteria with respect to five executives which must be achieved for them to receive their respective Bonus Plan Payments.  These revisions resulted in the KERP and the KEIP and are discussed in greater detail below.

**B.      Bankruptcy Case Developments**

16.      As described in the Chern Declaration and the Lederman Declaration, pre-petition, the Company, through its investment banker Cowen and Company ("Cowen") engaged in a comprehensive marketing process to explore a sale, merger, acquisition and/or related transaction (a "Transaction") for the Company's assets.  As a result of this process, the Company received bids from three interested parties.  The Company and Cowen engaged in substantial negotiations with each of these parties, entering into letters of intent with two of them.  In each instance, all three parties indicated that they would require, at minimum, a large majority of the Debtor's employees to agree to be included in any Transaction.  Ultimately, the Company selected the bid of Draper Athena Management Co. Ltd. ("Draper Athena") to be the stalking horse bid.  The ASSET PURCHASE AGREEMENT with Draper Athena (a) requires the Debtor to cooperate with it in encouraging employees to continue employment with Draper Athena, and (b) conditions the sale on the continued employment of at least two-thirds of the Company's workforce.

17.      Since the Petition Date, the Debtor has continued to operate its business in a streamlined fashion, to conduct marketing to other interested bidders, and to prepare for and further the process towards a Transaction of the Company's assets.  Both Cowen and the Debtor believe that, based on the nature of its business and operations and its geographical presence, any purchaser of the Debtor's assets will similarly require that most of the Company's workforce be included in any Transaction.

18.      On January 17, 2017, the Debtor filed its MOTION OF DEBTOR FOR ORDERS (I) AUTHORIZING AND APPROVING (A) BIDDING PROCEDURES, (B) BUYER PROTECTIONS FOR STALKING HORSE, (C) PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) THE FORM AND MANNER OF

7

NOTICE;(II) SCHEDULING THE BID DEADLINE AND AUCTION (III) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND (IV) GRANTING RELATED RELIEF [Docket No. 32], (the "Sale Motion"), pursuant to which the Debtor requests the Court's approval of certain procedures (set forth on Exhibit "A" to the Sale Motion) which establish the terms and conditions of the competitive bidding and auction process by which the Debtor intends to sell its assets.  The Debtor will request that the Court set the dates for the auction and the hearing on the sale in March 2017.  The Debtor anticipates that a Transaction will close in March 2017.

      **C.**      **The KERP**

      19.      The KERP is a continuation of the Pre-Petition Bonus Plan but with two modifications (a) the removal of the five executives who are now the proposed participants in the KEIP (discussed below), and (b) an extension of its terms to apply to another 36 employees, with payments ranging from $1,333 to $39,000, aggregating to $438,000, to be paid in April 2017 or otherwise upon a change of control[5].  With respect to the Company's existing obligations to pay the Bonus Plan Payments under the Pre-Petition Bonus Plan, the KERP provides for the Company to honor such obligations which, combined with the additions, aggregates to disbursements of $1,213,000.00.  A table summarizing the KERP, indicating the eligible employees (collectively, the "KERP Participants"), their departments, the amounts due to each and timing for payment is attached hereto as **Exhibit "B"** and is incorporated herein by reference.

      20.      Certain of the KERP Participants may hold titles such as "manager" or "director," but they do not take part in the strategic management of the Debtor.  The KERP Participants do not generally attend senior management meetings, do not generally participate in board meetings or board committee meetings, and many of their duties are limited to particular divisions or

---

[5] The Pre-Petition Bonus Plan provided for bonuses in two installments, one of which has been paid.  The employees added under the KERP in November 2016, will receive only a single payment if this Motion is approved.

regions. Their respective scopes of authority are limited, and while their titles reflect their individual roles and functions, the same titles do not confer true officer status upon any KERP Participant.

21.     As described above, the Pre-Petition Bonus Plan was developed after careful consideration of numerous factors and due to the need to retain and motivate irreplaceable members of the Company's workforce, in view of the Synopsys Verdict and related ongoing litigation.  This need remains imperative after the Petition Date as the Company faces even more uncertainty in bankruptcy, must now overcome the perception of bankruptcy in the in eyes of its employees, and must preserve its going concern value to maximize a return for its creditors.  As instituted in April 2016, the Pre-Petition Bonus Plan omitted most of the Company's Taiwan employees and several U.S. employees, yet after marketing the Company's assets and communications with interested parties, it became clear that the Taiwan office, and in fact all of the Company's workforce, would be valued assets for any bidder in a Transaction.  As discussed above and in the Lederman Declaration, Draper Athena and other potential bidders all have expressed the need to retain at minimum, a majority of the Company's employees.  With this in mind, the Board and Company executives determined that employees which were not previously included in the Pre-Petition Bonus Plan, most of which are based in Taiwan, should be added.

22.     In addition, as a result of the bankruptcy case, KERP Participants are required to assume greater roles and perform additional services extending beyond their typical roles, to address the Debtor's needs relative to the bankruptcy case generally as well as to the sale of the Company's assets.  For example, members of the Company's research and development team are needed to assist in documenting all technological information and knowledge, including how to integrate the Company's operations from an engineering perspective, and also to respond to technical inquiries and provide demonstrations of the Company's technology to interested bidders during the sales process.  Members of the general and administration team have, in addition to typical business and finance matters, been tasked with managing the production of all information relative to the bankruptcy case and to ensure timely compliance with all Court and

9

United States Trustee requirements.

**D.      The KEIP**

23.      The KEIP is also a continuation of the Pre-Petition Bonus Plan as to five eligible

Company executives (the "<u>KEIP Participants</u>"), with the modification that each must achieve a

specified performance objective in order to receive their respective Bonus Plan Payments.  A

table summarizing the KEIP indicating the eligible KEIP Participants, their titles, the amounts

due to each, the timing for payment and the performance objectives required of each is attached

hereto as **Exhibit "C"** and is incorporated herein by reference.

24.      As with the KERP, the Company's Board, advisors, and executives, and the

Compensation Committee conferred on several occasions to evaluate the Pre-Petition Bonus Plan

with respect to developing the KEIP.  The five senior executives who comprise the KEIP

Participants each hold critical operational leadership or corporate management positions within

the Company.  The KEIP Participants are responsible for, among other things, essential day-to-

day business functions, overseeing the development of the Company's technology and products,

executing the Debtor's business plan, implementing the operational goals of the Debtor's chapter

11 case, assisting the Debtor's bankruptcy counsel in preparing essential documents, maintaining

relations with employees, vendors and customers, and responding to requests for diligence by

potential purchasers of the Company's assets.  Given their essential roles in the Debtor's

business and their roles and duties assumed during the bankruptcy case which exceed their pre-

existing responsibilities, the KEIP Participants must remain involved and fully engaged in order

to drive performance and results with respect to the bankruptcy case and the sale of the Debtor's

assets.

25.      The performance objectives for each KEIP Participant ensure that specific tasks

are accomplished which the Debtor and the Board have identified will maintain, if not

substantially increase, the value of the Company.  For example, three KEIP Participants are

required to develop and deliver a new release of the Company's key software product in the first

quarter of 2017, in a compressed time period, with specific technical requirements required to

ensure that the Company's products do not infringe Synopsys' products.  In view of the ongoing litigation with Synopsys, including litigation of patent infringement claims as described in the Chern Declaration, the milestones of these KEIP Participants will certify the quality of the Debtor's products against infringement claims and provide comfort to both customers and potential bidders.  The other two KEIP Participants are, in addition to their traditional roles, required to manage the bankruptcy and sale process, and to maintain and foster relationships with investors, employees and customers.  They have, in addition to their executive-level duties, assumed the direct roles of overseeing the bankruptcy case and the sale process, in order to ensure a successful result for the bankruptcy estate and its constituents.

26.    In sum, the KEIP is a narrowly tailored plan, payable only upon either (a) completion of the development of software products with specific identified technical features with respect to three KEIP Participants, or (b) consummation of a Transaction with respect to two KEIP Participants, developed after a comprehensive, detailed analysis by the Company, the Board and the Compensation Committee, designed to incentivize a distinct group of employees who are invaluable to the Company, to achieve a maximum return from any sale Transaction.

## II.    BASIS FOR RELIEF REQUESTED

### A.    The Compensation Programs Are Authorized Under Section 363(b).

27.    Section 363(b) provides, in relevant part, that a debtor-in-possession "after notice and a hearing, may use, … other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  In analyzing section 363(b), courts will authorize the use, sale or lease of estate property outside the ordinary course of business when there is a "sound business purpose" that justifies the transaction. *See Dai-Ichi Kangyo Bank Ltd v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (adopting the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business

11

before the bankruptcy judge may order such disposition under section 363(b)."); *Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (applying standard from *Lionel Corp.* in context of proposed "use" of estate property); *Travelers Insurance Co. v. Plaza Family Partnership*, 95 B.R. 166, 173 (Bankr. E.D. Cal. 1989) (citing both *Continental* and *Lionel Corp.* in context of proposed "use" of estate property).  The business judgment rule shields a debtor's management from judicial second-guessing. *See id.*; *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification).

28.    Thus, under section 363(b), a debtor must establish a valid business purpose for the proposed use of estate property outside the ordinary course of business. *In re Lionel Corp.*, 722 F.2d 1070-71.  Thereafter, the business judgment rule applies to create "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  Because "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence," courts generally uphold management's exercises of business judgment "as long as they are attributable to any rational business purpose." *In re Integrated Resources, Inc.*, 147 B.R. at 656 (internal citations and quotations omitted).

29.    Historically, courts have approved employee compensation programs pursuant to section 363(b)(1) when: (1) a debtor has used proper business judgment in formulating such a program, and (2) the court found that the program was fair and reasonable. *See, e.g.*, *Montgomery Ward*, *supra*, 242 B.R. at 154 (affirming bankruptcy court approval of the key employee retention program on the basis that debtors showed a "sound business purpose" justifying such approval); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) ("Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action.  The reasonable use of incentives and

12

performance bonuses are considered the proper exercise of a debtor's business judgment.") (citations omitted); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (applying business judgment rule and approving incentive plan which was within debtor's fair and reasonable business judgment).

30.     Here, the Debtor has determined that it requires as many as possible of its employees to remain with the Company to maximize its value as a going concern and that its employees remain focused and provide their maximum efforts while fulfilling myriad duties, including additional duties, without distraction, in servicing and enhancing certain aspects of the Company for the Sale Transaction.  With these goals in mind, the Debtor developed the Compensation Programs which they believe will assist in retaining the KERP Participants, motivating the KEIP Participants and maximizing value for any sale Transaction.  Consequently, implementation of the Compensation Programs, as proposed herein, is well within the Debtor's fair and reasonable business judgment rule and is authorized under section 363(b).

**B.     The Compensation Programs Are Authorized Under Section 503(c).**

**1.     Sections 503(c)(1) and (c)(2) Are Inapplicable.**

**a)     The KERP Does Not Provide for Payments to Insiders.**

31.     As noted above, sections 503(c)(1) and (c)(2) of the Bankruptcy Code mandate restrictions upon retention and severance plans for "insiders."  The Bankruptcy Code defines "insider" in part to include "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; . . . (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).  While a person holding an officer's title is presumptively an officer and thus an insider, that presumption may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *In re Foothills Texas, Inc.*, 408 B.R. 573, 574-75 (Bankr. D. Del. 2009). 31.  As set forth above and in the Chen Declaration, none of the KERP Participants take part in the strategic management of the Debtor or attend senior management or

board meetings.  Accordingly, the KEIP Participants are not "insiders" within the meaning of the Bankruptcy Code, and sections 501(c)(1) and (c)(2) of the Bankruptcy Code do not apply to the KERP.

### b)      The Compensation Programs Do Not Provide For Severance.

32.      Section 503(c)(2) of the Bankruptcy Code is further inapplicable because it applies only to severance paid to insiders. As discussed above, the KERP Participants are not insiders, and, at any rate, neither Compensation Program is a severance plan because, among other things, the compensation to be awarded thereunder is not triggered by, or otherwise dependent upon, the termination of any participant's employment. Section 503(c)( 2) of the Bankruptcy Code is therefore inapplicable.

### c)      The KEIP Is Based Solely on Incentives.

33.      In addition to section 363(b), employee compensation programs should be considered under section 503(c) which prohibits the allowance and payment of administrative expenses under certain circumstances.  Generally, section 503(c)(1) prohibits payments to insiders "for the purpose of inducing such person to remain with the debtor's business" i.e., retention payments, without meeting certain specified criteria; section 503(c)(2) prohibits payments of severance to insiders without meeting certain specified criteria; and section 503(c)(3) prohibits payments "…outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(1)-(3).

34.      Based on the statute's plain language, neither of sections 503(c)(1) and (2) apply to the KEIP which is solely an incentive-based program with no severance component.  The Debtor, however, is cognizant that there exists sensitivity to the proposal of programs which are facially incentive programs but are actually retentive in nature.  As explained by one bankruptcy court:

> Attempts to characterize what are essentially prohibited retention

programs as "incentive" programs in order to bypass the
requirements of section 503(c)(1) are looked upon with disfavor, as
the courts consider the circumstances under which particular
proposals are made, along with the structure of the compensation
packages, when determining whether the compensation programs
are subject to section 503(c)(1). *See, e.g., In re Dana Corp.*, 351
B.R. 96, 102 (Bankr.S.D.N.Y.2006) ('Dana I') (stating that if a
bonus proposal "walks like a duck (KERP), and quacks like a duck
(KERP), it's a duck (KERP).")

*Mesa Air Group*, 2010 Bankr. LEXIS 3334, at *5-*6 (Bankr. S.D.N.Y. Sept. 24, 2010).

35.     Notably, the case cited in *Mesa Air Group*, *In re Dana Corp.*, involved a proposed
"completion bonus" which the court determined would be "awarded without regard to
performance or creditor recovery" if the recipient remained with the company on the effective
date of a confirmed plan.  The court concluded that such benchmark, which is a goal of any
chapter 11 case, constituted a retention, and not an incentive, bonus, and therefore must satisfy
the criteria under section 503(c)(1). *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr.S.D.N.Y.2006).
That case, therefore, is inapposite to the instant circumstance where the KEIP is awarded based
only on development and completion of software products or consummation of the Sale
Transaction, and therefore based on performance with a direct tie to creditor recoveries.

36.     It is inherently unavoidable that *any* payment to an employee has at least a partial
purpose of retaining the employee.  If, in considering whether to approve a management
incentive plan, courts did not weigh the level and materiality of the retentive nature of the plan,
all payments to insiders would be subject to section 503(c)(1).  For example, in *In re Nellson*
*Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007), the court explained that section
503(c)(1) is invoked with "a transfer made to . . . an insider of the debtor for the [primary]
purpose of inducing such person to remain with the debtor's business." *Id*. at 802.  Other courts
similarly have examined which competing purpose, retention or incentive, is primary.  As one
court explained, "merely because a plan has some retentive effect does not mean that the plan,
overall, is retentive rather than incentivizing in nature." *In re Dana Corp.*, 358 B.R. 567, 571
(Bankr. S.D.N.Y. 2006).  Applying the section 503(c)(1) analysis there, that court held: "By
presenting an executive compensation package that properly incentivizes the CEO and Senior

15

Executives to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply." *Id.* at 584.  A Delaware bankruptcy court similarly has explained that section 503(c)(1) does not apply "if a bonus plan is not primarily motivated to retain personnel." *In re Global Home Products*, 369 B.R. 778, (Bankr. D. Del. 2007)(finding section 503(c)(1) inapplicable to proposed plans that were "primarily incentivizing and only coincidentally retentive.").

37.     Here, the proposed incentive payments are based on the consummation of two separate milestones: (a) with respect to three executives, the expedited development and delivery of a new version of the Debtor's software product, meeting specific technical requirements to ensure it will not infringe as will be required by any potential purchaser, and (b) with respect to two executives, compliance within the bankruptcy case, managing operations, maintaining Company relationships and moral, and successfully closing a sale Transaction with maximum return.  The KEIP contains no retention or severance components.  In fact, the Company purposefully added incentive milestones to the Pre-Petition Bonus Program in establishing the KEIP, which each KEIP Participant must achieve in order to receive payment.  Inherently, each KEIP Participant must remain with the Company through the completion of the new software or the Sale Transaction to receive his or her share of the Incentive Pool; however, this is a necessary ramification of the implementation of the program and is not intended to induce the KEIP Participants to stay.  Instead, the requirement that KEIP Participants remain ensures that each KEIP Participant performs at a high level, fully satisfies his or her duties to the Company and executes the delineated additional services and tasks under the KEIP, that are imperative to maintaining the Company's critical business aspects and enhancing the value of the Debtor's assets being sold.  Therefore, the KEIP is properly characterized as a performance-based incentive plan and not as a retention plan for insiders subject to the requirements of sections 503(c)(1) and  (c)(2).

### 2. The Compensation Programs Satisfy Section 503(c)(3) and Are in the Best Interests of Creditors.

38.     While sections 503(c)(1) and (c)(2) do not apply here, "a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case … the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A)." *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("*Dana II*").  Accordingly, the Court may evaluate the Compensation Programs under section 503(c)(3) to the extent they propose payments outside of the ordinary course of business.

### a) The Business Judgment Standard Is Met.

39.     Some courts that have analyzed the prohibition on "other transfers" in section 503(c)(3) have applied the standard applied under section 363(b) - specifically, transfers are permitted if made in the exercise of a debtor's business judgment and warranted by the facts and circumstances of the case. *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Group, Inc.*, 2011 Bankr. LEXIS 1537 at *31-*32 (Bankr. S.D.N.Y. Apr. 27, 2011); *Dana II*, 358 B.R. at 576 (applying "sound business judgment" standard); *Global Home Prods., supra*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."). As set forth above, it is well within the Debtor's reasoned business judgment that the Compensation Programs are necessary.

### b) The Compensation Programs are Justified by the Facts and Circumstances.

40.     In addition to the business judgment standard, the *Dana II* court delineated factors (the "Dana Factors") to determine whether a proposed incentive plan is justified by the facts and circumstances and permitted under section 503(c), including:

17

- whether the plan has a reasonable relationship to the results to be obtained;

- whether the cost is reasonable in light of the debtor's assets, liabilities, and earnings potential;

- whether the scope of the plan is fair and reasonable or discriminates unfairly;

- whether the plan comports with industry standards;

- whether the debtor undertook due diligence in investigating the need for a plan; and

- whether the debtor received independent counsel in performing due diligence in creating and authorizing the incentive compensation.

*Dana II,* 358 B.R. at 576-77; *see also In re Global Home Prods.*, 369 B.R. at 786.

41.     The Compensation Programs satisfy each of the Dana Factors.  The programs are based on the Pre-Petition Bonus Plan which was developed under the direction of the Bonus Compensation Committee comprised of three independent individuals with an immeasurable amount of experience managing and directing companies within the industry, with guidance from Debtor's corporate counsel, Wilson Sonsini Goodrich and Rosati, P.C.  The Bonus Compensation Committee designed the Pre-Petition Bonus Plan with the goal of retaining employees and motivating them to continue their efforts under the cloud of the Synopsys Verdict and then revisited the plan in view of the impending bankruptcy filing.  The terms of the Pre-Petition Bonus Plan, including the bonus payments to be made thereunder, were developed after careful and extensive consideration and were determined to be fair, reasonable and necessary to achieve the goals of the plan.  Indeed, the Pre-Petition Bonus Plan was modified as to certain executives to require them to meet specific benchmarks in order to receive the Plan Bonus Payments already pledged to them under the Pre-Petition Bonus Plan.  As set forth in the Beers Declaration, the Debtor's financial advisor Cowen has reviewed the Compensation Programs and determined that they are fair and reasonable within industry standards, and necessary to achieve their goals.

42.     Generally, both Compensation Programs are designed to motivate participating

employees for their significant efforts in these chapter 11 cases, to ensure that management and employees continue to focus their full effort and attention on the Debtors' day-to-day operations and affairs, and to fairly compensate participating employees for the increased demands placed upon them during the bankruptcy case.

43.    The KERP is particularly intended to retain as many employees as possible, which is necessary maximize the going concern value of the Company and the value to be achieved from a sale.  Athena Draper, in addition to any other bidder at the sale, will require the greater majority of the Debtor's employees remain as a condition to any Sale Transaction.  The KERP is based on the Pre-Petition Bonus Plan which was designed specifically to retain employees in view of the Synopsys Verdict and then in view of the bankruptcy filing.  The KEIP is particularly intended to incentivize certain individuals to ensure a successful sale in the bankruptcy case with as much as a return as possible.  With respect to three KEIP Participants, they are required to develop and deliver a new version of the Debtor's main software product, meeting specific technical requirements, under a compressed timeline and additional burdens from the bankruptcy case.  This product is a key asset for Athena Draper and any other potential purchaser, all of which will require that the technical requirements – which will insure the software is non-infringing – are achieved. With respect to the other two KEIP Participants, they are required, in addition to their usual roles, to direct the entire bankruptcy process, maintain employee morale, preserve important customer and vendor relationships and manage and coordinate a successful section 363 sale, in order to receive payment under the KEIP.  In other words, they are tasked with ensuring maximum value of the Company and its assets are sustained and maximum value from a sale is obtained.

### C.    The KEIP Is Warranted Under Section 105(a).

44.    Bankruptcy Code Section 105 provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

45.    As detailed above, the Compensation Programs are critical to the Debtor's efforts

19

to maximize the value of the estate through the consummation of a going concern sale Transaction which will require the preservation of the Debtor's workforce as well as a new software product design free from the specter of infringement claims.  The focused efforts of the KEIP Participants in maintaining the Company's workforce, in enhancing key aspects and relationships, in consummating the Sale Transaction, in preserving the going concern value of the Company, and thus, in maximizing the return for the estate, are essential to the Debtor.  The costs associated with the Compensation Programs are reasonable and necessary and are justified by the benefits that the Debtor will realize as a result of the indispensable services of the participants.  The Compensation Programs, therefore, are warranted under section 105(a).

### REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

46.     The Debtor requests a waiver of any fourteen-day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h) which provides in part that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth above, the Compensation Programs are essential for the Debtor to operate its business without interruption and to preserve value for the estate.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### NOTICE AND NO PRIOR REQUEST

47.     Notice of this Application has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtor's creditors holding the twenty (20) largest unsecured claims as set forth in the list filed with the Debtor's voluntary chapter 11 petition; (c) the Debtor's secured lender, Silicon Valley Bank; and (d) all parties who have requested notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

48.    No prior request for the relief sought in this Application has been made to this or any other Court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter its Order, substantially in the form attached hereto as **Exhibit "A"**, granting the Motion, and granting such other and further relief as the Court deems just and proper.

Dated: January 24, 2017                    **DORSEY & WHITNEY (DELAWARE) LLP**

                                           */s/  Eric Lopez Schnabel*
                                           Eric Lopez Schnabel (DE Bar No. 3672)
                                           Robert W. Mallard (DE Bar No. 4279)
                                           Alessandra Glorioso (DE Bar No. 5757)
                                           300 Delaware Avenue, Suite 1010
                                           Wilmington, Delaware 19801
                                           Telephone: (302) 425-7171
                                           Facsimile: (302) 425-7177
                                           E-mail:  schnabel.eric@dorsey.com
                                                    mallard.robert@dosey.com
                                                    glorioso.alessandra@dorsey.com
                                           ***Proposed Attorneys for ATopTech, Inc.***

4819-4741-0496/2